653 A.2d 958

**Lisa Dorene SCHWARTZ**

v.

**STATE of Maryland.**

**No. 814, Sept. Term, 1994.**

Court of Special Appeals of Maryland.

Feb. 10, 1995.

Laurie S. Haas, Law Student admitted pursuant to Rule 16 (Stephen E. Harris, Public Defender, and Michael R. Braudes, Asst. Public Defender, on the brief), Baltimore, for appellant.

Rachel Marblestone Kamins, Staff Atty. (J. Joseph Curran, Jr., Atty. Gen., Gwynn X. Kinsey, Jr., Asst. Atty. Gen., Baltimore, and Joseph L. Cassily, State's Atty. for Harford County, Bel Air, on the brief), for appellee.

Argued before BISHOP, ALPERT, CATHELL, JJ.

BISHOP, Judge.

The State charged appellant, Lisa Doreen Schwartz, with three counts of theft and three counts of misappropriation by a fiduciary. After a bench trial before the Circuit Court for Harford County, appellant was convicted of two counts of theft and two counts of misappropriation by a fiduciary; the court merged count one (Art. 27, § 342) into counts two (Art. 27, § 342) and three (Art. 27, § 342) and count four (Art. 27, § 132) into counts five (Art. 27, § 132) and six (Art. 27, § 132). Appellant received four concurrent five-year sentences, which the court suspended. The court ordered appellant to serve three years supervised probation, pay restitution, pay court costs, and perform 200 hours of community service.

*Issues*

Appellant raises five issues:

I. Was the evidence legally sufficient to sustain the convictions of theft and misappropriation by a fiduciary?

II. Did the trial court err in excluding evidence of appellant's good faith and lack of criminal intent?

III. Did the trial court err in admitting evidence of prior bad acts of which appellant was not charged?

IV. Did appellant voluntarily waive her right to a trial by jury?

V. Are convictions for both theft and misappropriation by a fiduciary inconsistent verdicts, or alternatively, must the sentences for misappropriation be vacated under the doctrine of merger?

## Facts

On August 12, 1989, Adams Homes, Inc. ("Adams Homes") and Ross and Joyce Blake ("the Blakes") contracted for the construction of a single-family modular home on the Blakes' property in Whiteford, Maryland. The Blakes were required to make a $4,900 deposit, plus four additional draws, for a total payment of $64,056. On August 23, 1989, Adams Homes and David A. and Laura A. Roman ("the Romans") contracted for the construction of a single-family modular home on the Romans' property in Pylesville, Maryland. The Romans' total payment of $87,000 was to be paid in four separate draws. The Romans' contract specified a completion date of October 10, 1989, or seventy-five days from the first draw, whichever occurred later. From August 1989 until March 1990, appellant managed the day-to-day affairs of Adams Homes, deciding which bills to pay and which checks to issue. Appellant also exercised direct authority and control over the construction of the Blakes' and the Romans' modular homes; however, neither Adams Homes, nor appellant, individually, had any working capital, or a line of credit, at the time the Blakes and the Romans contracted with Adams Homes. Because of the business's financial difficulties, appellant attempted to obtain a

line of credit from various financial institutions. Her attempts, however, were unsuccessful. Consequently, appellant's personal bank account and Adams Homes' bank account were repeatedly overdrawn.

Appellant signed all contract documents between Adams Homes and the Blakes and between Adams Homes and the Romans, and she controlled the funds the Blakes and the Romans deposited pursuant to their respective contracts. Appellant, however, failed to place the funds paid to Adams Homes by the Blakes and the Romans in escrow accounts, as required by Md.Real Prop.Code Ann., § 10–502 (1988). Additionally, appellant's records did not indicate how the funds paid by the Blakes and the Romans were applied under the respective sales contracts.

Appellant's record-keeping system and her business practices were deplorable. Paula Brown, an Adams Homes employee, testified that appellant often was unaware of the current balance in the checking account of Adams Homes, and that checks were removed from the checkbook without being recorded. Many checks were written out of sequence, deposits and non-check debits were not entered into the checkbook, and no separate records of debits and credits to the business's bank account were maintained. As a result, the Adams Homes checking account frequently had insufficient funds to cover the checks presented for payment.

At trial, appellant attributed Adams Homes' financial difficulties to a $30,000 bookkeeping error that Ms. Brown had made. Appellant also blamed Ms. Brown for the business's inadequate bookkeeping system. The trial court, however, rejected these contentions, stating that "[t]his is not a situation where proper accounting procedures had been established and then an employee for some period of time failed to follow those established procedures. Procedures were non-existent in this company."

Bank records show that "no accounting error ... caused the bank overdrafts. There was simply a lack of cash on hand and an unwillingness to face that fact." For example, all

checks presented on the Adams Homes account between December 1, 1989 and December 11, 1989 were dishonored because of insufficient funds. On December 12, 1989, Adams Homes made a $10,000 checking account deposit, which corresponded to the Romans' "third-draw payment" of $10,000 made the previous day. At the time the $10,000 deposit was made, the account was overdrawn by $483.21. The next deposit made on December 18, 1989, consisted of a $30,000 item and a $2,956.60 item.

Between December 11, 1989, the date that Adams Homes received the Romans' payment, and December 17, 1989, the day before the $32,956.60 deposit, Adams Homes wrote checks in excess of $13,000. Additionally, at least eight checks, written by Adams Homes prior to December 11, 1989, cleared against the Romans' $10,000 deposit. Those checks included a $600 check made payable to Meredith Britton, Adams Homes's sales manager, and a $157.50 check made payable to Lydia Britton for "casual labor." Between December 18, 1989 and December 29, 1989, checks amounting to approximately $35,000 were written against the $32,956.60 deposited in the Adams Homes checking account on December 18, 1989. During the construction of the Romans' and the Blakes' homes, appellant issued checks to herself from the Adams Homes checking account that contained funds deposited by several Adams Homes home buyers, including the Romans and the Blakes. Appellant also wrote checks from this account for payroll expenses, her mother's rent, her daughter's musical instruments, and other personal expenses. Because all funds received by Adams Homes were deposited into one checking account, and because the majority of checks written contained no notation concerning the job to which it applied, there was no way to determine the construction costs of a particular home or the monies owed to subcontractors working on a particular home site.

Regarding the construction of the Romans' home, the Romans wrote three checks, designated as the "first draw," prior to the delivery of their modular home: $1,500 on August 10, 1989, $5,000 on August 28, 1989, and $8,500 on September 8,

1989. The Romans paid the second draw on the contract by a bank check made payable to Contempri Homes, the manufacturer of the modular home, in the amount of $49,800. The third draw on the contract was paid on December 11, 1989, by way of a $10,000 check, and on February 8, 1990, by way of a $7,900 check. Because of continued delays in the completion of their home, however, the Romans did not pay the final draw of $4,380, and terminated their contract.

The Romans finished the construction of their home and obtained their use and occupancy permit themselves, expending approximately the amount of the final draw still owing on their contract with Adams Homes. Although they completed the construction of their house, the Romans did not complete the construction of their garage. According to Mr. Roman, the cost of completing the garage would be $10,000. Appellant testified that all materials for the garage had been purchased by Adams Homes and were being stored in the company's warehouse at the time the Romans terminated their contract. The charges of theft and misappropriation by a fiduciary, for which appellant was convicted, arose, in part, out of appellant's failure to complete construction on the Romans' garage.

Regarding the construction of the Blakes' home, the Blakes paid Adams Homes $7,495 prior to February 8, 1990 to begin construction. The Blakes paid the second draw, $41,911 directly to Contempri Homes, and the third draw, due on February 8, 1990, was paid to Adams Homes in two installments; $6,450 on February 13, 1990, and $1,000 on February 23, 1990. The final draw of $2,200 was due on February 23, 1990. Because of numerous delays, however, the Blakes, like the Romans, terminated their contract and completed the construction themselves.

The draw schedule and specifications for the Blakes' home provided that the chimney would be completed as part of the first draw and that the basement windows and exterior door would be completed as part of the third draw. According to

the Blakes, these items were never constructed or installed. The State placed the following values on these items:

| | |
|---|---|
| two basement windows | $ 540.00 |
| basement door | 850.00 |
| 2 standard Anderson windows | 150.00 |
| chimney | 750.00 |

Although the parties disputed whether the chimney was constructed and whether the basement windows and door were installed, the court found, as a matter of fact, that Adams Homes failed to build the chimney and install the windows and doors as promised. Accordingly, appellant was convicted on charges of theft and misappropriation of funds for "failure to deliver and construct those items, or otherwise hold the money for those items in escrow."

### Discussion

### I. Sufficiency of the Evidence

### Standard of Review

In *Thomas v. State,* 2 Md.App. 502, 235 A.2d 777 (1967), this Court restated the test for sufficiency of the evidence in a case tried before the court without a jury:

> The test ... is whether the evidence, if believed, either shows directly or supports a rational inference of the facts to be proved, from which the court could fairly be convinced, beyond a reasonable doubt, of the defendant's guilt of the offense charged.

*Id.* at 507, 235 A.2d 777. With this principle in mind, we address appellant's contentions that the evidence adduced at trial was insufficient to support her conviction under Md.Ann. Code art. 27, § 132 (1992) (hereinafter "§ 132"), for misappropriation of funds by a fiduciary, and her conviction under Md.Ann.Code art. 27, § 342 (1992), for theft of goods over $300.

Appellant asserts that the evidence was insufficient to show that she was a fiduciary as contemplated within § 132, and therefore, she may not be convicted of fraudulent misappropriation. Section 132 provides:

> If ... any fiduciary shall fraudulently and wilfully appropriate to any use and purpose not in the due and lawful execution of his trust, any money ... which may come into his hands ... in any ... fiduciary capacity, or secrete it with a fraudulent intent to appropriate it to such use or purpose, he shall be deemed guilty of embezzlement, and shall be punished upon conviction by imprisonment in the penitentiary for not less than one year nor more than five years.

To convict appellant under this section, the State was required to prove not only the existence of a fiduciary relationship, but also the existence of a specific intent of fraud and wilfulness on appellant's behalf. Md.Ann.Code art. 27, § 132 (1992).

Regarding the nature of the requisite fiduciary relationship, this Court, in *Andresen v. State,* 24 Md.App. 128, 331 A.2d 78 (1975), relied on the *Black's Law Dictionary* (4th ed. 1951) definition of "Fiduciary Capacity" to determine whether the appellant was a fiduciary within the contemplation of § 132:

> "One is said to act in a 'fiduciary capacity' or to receive money or contract a debt in a 'fiduciary capacity,' *when the business he transacts, or the money or property which he handles, is not his own or for his own benefit, but for the benefit of another person, as to whom he stands in a relation implying and necessitating great confidence and trust on the one part and a high degree of good faith on the other part.* The term is not restricted to technical or express trusts, but includes also such offices or relations as those of an *attorney at law,* a guardian, executor, or broker, a director of a corporation, and a public officer."

*Id.* at 148–49, 331 A.2d 78 (first emphasis added).

In the instant case, appellant asserts that her relationships with the Romans and the Blakes were contractual, not fiduciary. Appellant argues that the custom home contracts she executed with the Blakes and the Romans dictated her conduct, and that neither contract imposed a fiduciary duty or duty of trust upon her or upon Adams Homes. The State contends, however, that the Maryland Custom Home Protec-

tion Act ("MCHPA"), Md.Real Prop.Ann.Code, § 10–502 (1988) ("§ 10–502"), imposes a fiduciary duty upon appellant, and therefore, she may be charged under § 132.

We agree with appellant that she is not a fiduciary as contemplated within the meaning of § 132, and therefore, that her conviction under this section must be reversed. A person acts in a fiduciary capacity when the money he or she handles "is not his [or her] own or not for his or [her] own benefit." The monies appellant received from the Romans and the Blakes were received pursuant to the terms of their custom home contracts, in which Adams Homes agreed "to furnish labor and material in connection with construction, erection, or completion of a custom home." *Id.* § 10–501(e). The contracts identify Adams Homes as the "seller" and the Romans and the Blakes as the "buyers." Specifically, the "New Home Sales Contract" executed between Adams Homes and the Romans stated that "[i]n consideration of the mutual covenants and promises hereinafter set forth, Seller agrees to sell and the Buyer agrees to purchase upon the terms and conditions set forth in this Contract." The draw schedules incorporated into both contracts dictated the terms of payment and "set[ ] forth with particularity the sum to which the custom home builder shall be entitled as progress payment on the custom home contract after certain specified items of work have been completed on the custom home." *Id.* § 10–501(g). Therefore, Adams Homes was entitled to receive the progress payments after certain specified items of work had been completed on the homes.

Any failure by Adams Homes to complete the specified items of work pursuant to a home buyer's custom home contract logically results in an action for breach of contract, and perhaps, a violation of the MCHPA. The nature of both the Romans' and the Blakes' dissatisfaction with appellant is that she failed to perform specific items of work under their custom home contracts. In particular, the Romans terminated their custom home contract with appellant because of continued delays in the construction of their garage. Similarly, the Blakes terminated their contract with appellant because of

appellant's failure to construct their chimney and install basement windows and an exterior door in a timely manner. In addition to complaints that appellant failed to perform under the custom home contracts, allegations were made that appellant breached her duty to maintain funds, received pursuant to the custom home contracts, in the manner set forth by the MCHPA.

The Maryland Legislature enacted the MCHPA for the purpose of

> requiring certain payments to custom home builders to be held in trust; providing for certain funds to be kept in escrow; providing for a surety bond in lieu of an escrow fund; defining certain terms; providing that certain contracts be in writing; providing that the contract shall provide certain information and disclosures under certain conditions; providing that certain provisions of law apply to a sale by a vendor or builder that has outstanding a certain number of certain contracts; *providing for penalties for certain violations of this Act;* and generally relating to custom home contracts.

1986 Md.Laws ch. 853 (Emphasis added). Section 10–502 of the MCHPA reads:

> Any consideration received by a custom home builder in connection with a custom home contract shall be held in trust for the benefit of the buyer. Payments made to subcontractors or suppliers in connection with the custom home contract shall be consistent with the trust.

The Maryland Legislature has provided a comprehensive remedial scheme for MCHPA violations. The penalty for a violation of the trust defined in § 10–502 constitutes "a misdemeanor, and on conviction, any violator is subject to a fine not exceeding $1,000 or imprisonment not exceeding 1 year, or both." Md.Real Prop.Code Ann., § 10–507(b) (1988). Appellant, however, was not charged under § 10–507.

■ Prior to the 1986 enactment of the MCHPA, "[a] contractor's obligation to the owner [was] to finish and turn over the house without liens, but this [did] not prevent [the

contractor] from using his receipts from one contract to pay on another." *Bounds v. Nuttle,* 181 Md. 400, 408, 30 A.2d 263 (1943). In *Bounds v. Nuttle,* the Court of Appeals stated:

> Contractors building a number of houses frequently have separate accounts with material men. The contractor can apply this money on any bill he owes. It does not have to be applied on the bill for the materials for the house from the contract for which he obtained it.

*Id.* Maryland law, however, now requires a custom home builder to place the money advanced as consideration for labor and materials by the buyer in an escrow account and to use the money to pay "documented claims of persons who have furnished labor or material, including fuel, in connection with the custom home contract for which the funds were advanced." Md.Real Prop.Code Ann., § 10–504(b)(2) (1988). The purpose of the MCHPA is to provide a specific remedy for custom home owners dealing with impecunious contractors.

The State argues that it may prosecute appellant under § 132 for her violations of the MCHPA. We disagree. First, appellant's "fiduciary duty," which the State uses to bring appellant within the ambit of § 132, arises from a trust relationship created by the legislature between custom home owner and custom home builder and imposed in order to *regulate the industry of custom home building.* 1986 Md. Laws ch. 853. The General Assembly has provided a specific penalty for custom home builders who violate the statutorily created trust, and therefore, appellant may not be punished under § 132 merely because she disobeyed certain provisions of the MCHPA.

In *Henry v. State,* 273 Md. 131, 328 A.2d 293 (1974), the appellant was indicted for the theft of a motor vehicle. Upon being convicted, the trial court sentenced the appellant to fifteen years, the maximum penalty for the theft of goods over $100. Md.Ann.Code art. 27, § 340 (1973). The maximum penalty for the larceny of a motor vehicle, however, was fourteen years. Md.Ann.Code art. 27, § 348 (1973) (Repealed by Acts 1978, ch. 849, § 4). The Court of Appeals recognized

that "[w]here there is a specific enactment and a general enactment 'which, in its most comprehensive sense, would include what is embraced in the former, the particular enactment must be operative, and the general enactment must be taken to affect only such cases within its general language as are not within the provisions of the particular enactment.'" *Henry v. State*, at 134 n. 1, 328 A.2d 293 (quoting *Maguire v. State*, 192 Md. 615, 623, 65 A.2d 299 (1949)). Accordingly, the Court of Appeals held that "the prosecution was obliged to be under § 348, the specific enactment." *Id.* On remand, the Court ordered that the appellant be resentenced to no more than fourteen years under § 348. *Id.* at 151, 328 A.2d 293.

In light of the MCHPA's regulatory purpose, we hold that the Legislature intended the penalty provided in § 10–507 to be exclusive. Therefore, even if we were to hold that appellant is a "fiduciary" within the contemplation of § 132, general principles of law dictate that, because the Legislature enacted the special remedy set forth in § 10–507 and intended it to be exclusive, the State must punish appellant under § 10–507 for her violations of the MCHPA.

As we stated *supra*, to convict someone under § 132, the State must prove a specific intent of fraud and wilfulness. The trial court made the following findings of fact:

1. [Appellant's] inadequate record keeping system prevented her from keeping track of what was actually spent on any particular house, including the Roman and the Blake houses. The vast majority of the checks written contained no notation as to the job to which it applied. Time records for company employee's [sic] work are sketchy and incomplete.

2. It is clear that the Romans did not receive the garage for which they bargained and paid.

3. There [wa]s ... no indication that [appellant] had ... a criminal intent to deprive the Romans of a replacement refrigerator.

4. Failure to turn [construction] materials over to the Romans or to at least tender them, for pick up at the

warehouse by the Romans constituted a conversion of those materials to [appellant's] own use.

5. [A]ll materials for the garage had been purchased by Adams Homes and were stored in their warehouse at the time the Romans terminated the contract and took possession of the job.

6. The documents make it clear that the Blakes were due to receive a chimney as part of the first draw and the exterior door and windows in the basement as part of the third draw.

7. The chimney was never built and the door and windows were not delivered or installed.

8. Payroll was written against the funds deposited by the Romans and the Blakes for laborers and non-construction personnel and subcontractors were paid on other jobs.

These factual findings served as the basis for appellant's conviction under § 132; however, none of these factual findings demonstrates that appellant possessed a specific intent to defraud the Romans or the Blakes. Although appellant's inadequate record keeping system, her failure to maintain escrow accounts, and her careless management of money paid pursuant to the custom home contracts places her in violation of the MCHPA, her transgressions do not support her conviction for embezzlement. The evidence before the court demonstrated that appellant mismanaged the funds for the construction of the custom homes and was juggling funds to keep her business afloat; however, there was no evidence to suggest that through this mismanagement appellant sought to defraud either the Romans or the Blakes.

 The State also prosecuted appellant under Md.Ann. Code art. 27, § 342 (1982) ("§ 342"), for theft of goods over $300. We fail to see, however, how appellant's failure to turn over the construction materials for the Romans' garage, or build the Blakes' chimney and install their windows and door, constitutes theft under § 342. "The unexcused failure of a contractor to render a promised performance when it is due is always a breach of contract...." *K & G Constr. Co. v.*

*Harris,* 223 Md. 305, 315, 164 A.2d 451 (1960) (quoting 3 A Corbin, *Contracts,* ¶ 708.) In the instant case, the Romans terminated the contract, took possession of the property, and completed the job themselves. The trial court states that "[w]hen [appellant] used the Romans' money to purchase the materials for the garage, those materials in fact belonged to the Romans. If [appellant] was unable to finish the job, then the materials should have been tendered to the Romans." This statement ignores the contractual relationship existing between the Romans and appellant.

Under § 342,

[a] person commits the offense of theft when he wilfully or knowingly obtains control which is unauthorized or exerts control which is unauthorized over property of the owner, and: (1) Has the purpose of depriving the owner of the property; or (2) Willfully or knowingly uses, conceals, or abandons the property in such manner as to deprive the owner of the property; or (3) Uses, conceals, or abandons the property knowing the use, concealment, or abandonment probably will deprive the owner of the property.

Md.Ann.Code art. 27, § 342(a). The State offered no evidence to demonstrate that appellant exerted unauthorized control over the materials purchased to construct the Romans' garage or that appellant willfully intended to deprive the Romans of their property. Adams Homes contracted with the Romans to build the Romans' garage and purchased the materials in order to perform its contract obligation. The Romans informed appellant that they were taking possession of the property and that they would be withholding their final draw payment because of the delays in the construction of their home. The trial court made no finding that the Romans requested the delivery of the purchased garage materials or that appellant refused any such request. The testimony of Mr. Roman indicates that upon payment of the third draw "everything through and including what was to be done for the third draw had been completed by Adams Homes." Therefore, at this point in time, Adams Homes had not breached the contract. The trial court does not explain why the Romans

are entitled to the materials purchased to construct their garage. Moreover, the court does not explain how Adams Homes' failure to perform its contract obligations to construct the Blakes' chimney and install their windows and exterior door constitutes theft.

Principles of criminal law are inapplicable to the problems arising out of these contractual disputes. If we were to permit the State to charge an impecunious contractor under the theft statute because the contractor failed to perform contract obligations adequately, each breach of contract could conceivably result in criminal charges against the contractor for theft. " 'Whenever parties themselves define the limits of their rights and obligations, the compact controls, and there is no room for the application of a legal theory to the contrary.' " *Republic Ins. Co. v. Board of County Comm'rs,* 68 Md.App. 428, 432, 511 A.2d 1136 (1986) (quoting *Mayor & City Council of Baltimore v. Maryland Casualty Co.,* 171 Md. 667, 672, 190 A. 250 (1937)). In the instant case, the Romans and the Blakes agreed to pay Adams Homes to construct custom homes on their properties. Adams Homes, in return for a certain sum of money, agreed to construct the homes and complete the work in accordance with an agreed upon schedule of draw payments. Any failure on the parts of Adams Homes or appellant to perform under the Blake and Roman contracts resulted in breaches of those contracts and possible violations of the MCHPA. Such failures to perform contractual obligations, however, should not have resulted in appellant's conviction for theft.

After considering all of the evidence in a light most favorable to the prosecution, we hold that no rational trier of fact could have found the essential elements of embezzlement or theft beyond a reasonable doubt. Accordingly, we reverse appellant's convictions for misappropriation of funds (§ 132) and theft for goods over $300 (§ 342).

### Remaining Issues

Appellant raises additional issues regarding the admission and exclusion of certain evidence, the voluntariness of her

waiver of a jury trial, and the inconsistent nature of her convictions for theft and misappropriation of funds. In light of our reversal of appellant's convictions, we need not address these issues.

JUDGMENT REVERSED. HARFORD COUNTY TO PAY THE COSTS.