11 A.3d 326

**Leon Thomas COLEMAN, Jr.**

v.

**STATE of Maryland.**

**No. 1559, Sept. Term, 2009.**

Court of Special Appeals of Maryland.

Dec. 28, 2010.

Elizabeth M. Walsh (Paul B. DeWolfe, Public Defender, on the brief), Washington, D.C., for appellant.

Brenda Gruss (Douglas F. Gansler, Atty. Gen., on the brief) Baltimore, MD, for appellee.

Panel: EYLER, DEBORAH S., WOODWARD, ARRIE W. DAVIS (Retired, Specially Assigned), JJ.

ARRIE W. DAVIS (Retired, Specially Assigned), J.

Leon Thomas Coleman, Jr., appellant, was charged with fifty-seven counts of theft, failure to hold money in an escrow account and other charges arising out of transactions relating to a construction project known as Kings Grant Court in Prince George's County. A jury trial was held in the Circuit Court for Prince George's County on June 8, 9, 10, 11 and 15, 2009. Several counts were *nolle prossed* and the trial judge granted judgments of acquittal as to others. Ultimately, the jury considered eight counts of theft over $500, in violation of § 7–104 of the Criminal Law Article and eight counts of failure to deposit money in an escrow account, in violation of § 10–301(a) of the Real Property Article. The jury found appellant guilty of all sixteen counts.

Appellant was sentenced to fifteen years' incarceration, with all but eighteen months suspended, for each count, and was given credit for time served. The trial judge ordered that the sentences for the two crimes against each victim run concurrently, and those eight concurrent sentences were to run consecutively, for a total period of twelve years' incarceration. The court also ordered restitution as to each victim, totaling $502,178.43.

## Issues Presented

Appellant presents three issues [1] for our consideration, which we have divided, rephrased and reordered as follows:

1. The issues raised by appellant, which we quote, are as follows:

(1) Whether the State presented sufficient evidence to convict [appellant] of both the specific crime of failure to escrow funds received, pursuant to the "Deposits on New Homes" subtitle, Md.Code Ann., Real Prop. § 10–301(a) and the general crime of theft. Md.Code Ann., Crim. Law § 7–104[;]

(2) Whether the trial court erred in not granting [appellant's] motion for judgment for acquittal, as dictated by this Court's holdings in *Schwartz v. State*, 103 Md.App. 378, 653 A.2d 958 (1995) [; and,]

(3) Whether the cumulative prejudicial effect of the State's rhetorical piling on an irrelevant inquiry deprived [appellant] of a fair and impartial trial[.]

I. Whether the circuit court erred in denying appellant's motion for judgment of acquittal on the charge of failure to escrow funds received;

II. Whether appellant was improperly prosecuted for theft by deception when the more specific criminal provisions of the Deposits on New Homes statutes were operative;

III. Whether the circuit court erred in denying appellant's motion for judgment of acquittal on the charge of theft by deception;

IV. Whether the circuit court abused its discretion in admitting in evidence the testimony of an Assistant Attorney General regarding administrative proceedings; and,

V. Whether the circuit court's order of restitution was supported by a preponderance of the evidence.

For the reasons set forth below, we shall reverse.

## Procedural and Factual Background

Opportunities Investment Group (OIG), a corporation formed by appellant and his wife, acquired the right to purchase a plot of land in Prince George's County known as Kings Grant Court. Kings Grant Court had been subdivided into eleven lots in 1978. A plat from that time indicated that some of the lots were in a flood plain. The State elicited testimony that obtaining permits from various county offices required surveys and submission of plans before commencement of actual construction on the lots, and that this process could take twelve to eighteen months and cost at least $100,000.

From mid-February through mid-June of 2004, appellant, on behalf of OIG, contracted with ten buyers to build homes on ten of the lots in Kings Grant Court and he assured them that he had only a small number of lots. Eight of the purchasers testified at trial and all gave similar testimony about their transactions. Appellant met with each of the lot purchasers; he claimed to have been building homes for years and that he had only a small number of lots remaining in the Kings Grant development. Appellant accompanied some of the purchasers, and directed others, to see other homes that

he either claimed to be building or gave the purchasers the impression that he was building. Appellant showed the purchasers drawings and floor plans. He also told some of the purchasers that they could expect their homes to be built within six or nine months. Appellant did not tell any of the purchasers that there were any problems that might cause a delay in construction, nor did he indicate that there were any difficulties in obtaining required permits, nor say anything about flood plains, although he told one purchaser that the flood plain would have to be filled in. He told some of the purchasers that he had already applied for some permits and would receive them within two months.

Each buyer executed a contract obligating OIG to convey a lot to the buyer and construct a house on it. Almost all of the contracts identified the cost of the lot and some indicated that the lot was not owned by appellant, but by an individual named Taro Gehani.[2] All of the buyers paid between $2,250 and $3,500 for blueprints and some made down payments or remitted deposits for their lots. The deposit of $2,500 remitted by Rana Harris was placed in OIG's escrow account, but the funds received for blueprints and the deposits of the other buyers were placed in OIG's operating account.

With respect to financing, appellant encouraged the buyers to secure preferential financing from Worldwide Financial Resources and he also volunteered to pay closing costs. Each of the buyers obtained a construction loan from First Mariner Bank or Washington Savings Bank in amounts ranging from $256,000 to $381,000 to cover the purchase of the lots, construction of the homes, closing costs, and interest payments. At the time of settlement, the borrowers received an initial advance on the loan. William Brenner, a senior vice president at First Mariner Bank, testified that the initial advances were made for the purchase of each lot so that the borrowers could

---

**2.** Appellant acquired the lots from Taro Gehani and, as a result, was able to transfer deeds to each purchaser at the time of the settlements. Appellant used $550,000 of the amount he received from the purchasers' initial advances to pay Gehani for the land.

receive the deeds to the land and become the owners of the property. After the initial advance was made, the bank held the remaining funds in a construction escrow account. OIG was to be paid pursuant to a draw schedule as construction progressed. According to Brenner, builders are not paid in advance, but are always reimbursed for their work. As a result, builders typically pull the permits and "start building right away so they get paid right away." Brenner described the Kings Grant Court transactions as "highly unusual" because, after the initial advances were made, time passed without any requests for first draws under the construction draw schedules.

Appellant contracted with Michelle Barnes of MDB Design Group, LLC (MDB), to convert conceptual drawings into blueprints. According to Barnes, MDB provided architectural drawings and permit processing, although neither she nor her partner was a licensed architect or engineer. MDB would typically prepare architectural drawings and then work with a registered architect who would review the drawings and stamp them. Appellant gave Barnes floor plans that were drawn by someone else and Barnes used them to prepare architectural drawings. Appellant paid MDB $3,000 for the architectural drawings.

On June 30, 2004, appellant also retained MDB to "hire someone to provide engineering services for him." MDB's work was

> [t]o prepare design and construction drawing, including site plans/civil, architectural, environment/erosion/sediment control, structural, medical, HVAC & plumbing, electrical, water and sewer plans, street construction, street grade establishment, storm water management application, flood plain studies, driveway entrances, paving plans, lot stakeouts, house location plans, final report certificates and fire safety.

In addition, MDB was to hold meetings with the developer and "obtain approvals of the Prince George's County building permits." The total contract price was $70,000. Appellant

paid MDB a deposit of $7,000 and later an additional payment of $7,000.

Barnes testified that, prior to the Kings Grant subdivision, she had never been involved with the development of a subdivision. She stated that appellant did not want to deal with engineers directly, so she retained an engineering group to work on the project. According to Barnes, the engineering group she retained submitted, through MDB, an application for a storm water management plan, but the plan was never approved by Prince George's County. Barnes testified that she never heard from appellant that MDB's services were terminated, but she did not receive any payment from him after the second payment of $7,000.

On June 30, 2004, appellant notified the purchasers that home construction was "moving right along" and that he had "initiated water and sewer permits, preconstruction and individual site plans for the Kings Grant Court subdivision." The only filing made by MDB on behalf of OIG, however, was the application to Prince George's County for approval of a storm water management concept plan, filed in September 2004, that was never approved.

On July 26, 2004, appellant sent another letter to the purchasers, stating that the required site plans had been completed, but he could not continue to pay interest on the purchasers' loans. He requested that the purchasers pay their own interest and that he would reimburse them later for interest payments they made.

In November 2004, appellant met with James Reid, CEO of Civtech Designs, an engineering and surveying firm with experience in developing subdivisions. Reid told appellant that it would cost approximately $100,000 to do the civil engineering design and surveying services for the development of Kings Grant Court and that the process would take at least one year. On November 16, 2004, appellant paid Civtech Designs half of a $10,000 retainer for site work planning. Thereafter, appellant made no more payments to Civtech.

On December 3, 2004, appellant notified the buyers that he had fired MDB and hired Civtech to ensure issuance of a grading permit. As a result of a "good financial plan," he wrote, the cost of their homes would not increase. Later that same month, First Mariner Bank notified its borrowers that no funds had been disbursed from their construction loans, aside from payments made at settlement, and that no draws would be allowed after the maturity date, sometime in early 2005. At that time, the loans would be considered immediately due and payable. Troubled by this advisement, the buyers, in late 2004, met to discuss the situation. They decided to hire Steve Gaskins, a consultant, to conduct a feasibility study and advise them as to how to proceed. After receiving Gaskins's feasibility study, most of the purchasers concluded that their homes could not be constructed unless "a lot of [remediation] work" was done. Of the eight purchasers who testified at trial, four had their property foreclosed upon, and three refinanced their loans as lot loans and owned their lots at the time of trial, although one of those owners had defaulted on his loan and one couple filed for bankruptcy.

## Discussion

### I

Appellant first contends that the evidence was insufficient to sustain his convictions for failing to deposit funds in an escrow account, as required by the Deposits on New Homes subtitle, § 10–301 *et seq.* of the Real Property Article (RP). Appellant argues that, to the extent that he had any obligation to escrow funds received from the purchasers, that obligation was extinguished when he deeded the properties to the buyers and did not continue until he completed construction of the improvements. Appellant further argues that the evidence was insufficient to establish beyond a reasonable doubt that OIG did not refund the monies it received from the purchasers.

The State counters that appellant's escrow obligation under the Deposits on New Homes subtitle was extinguished only upon the "granting of a deed to the property on which the residential unit is located," and not upon the granting of the

deed to the lot alone. The State further contends that the risk that appellant would take a purchaser's money and not use it for the construction of a home continued after the deeds to the lots were transferred to the purchasers and throughout the period of construction. The State urges us to construe RP § 10–301 as requiring a builder to hold in escrow any sums of money received from a purchaser, including the deposit, until completion of the house.

A determination of whether RP § 10–301 *et seq.* required appellant to escrow funds until he completed construction pursuant to the contracts requires an examination of the plain language of the Deposits on New Homes subtitle. The cardinal rule of statutory construction is to ascertain and effectuate legislative intention. *State v. Green,* 367 Md. 61, 81, 785 A.2d 1275 (2001) (and cases cited therein). Our " 'quest to discover and give effect to the objectives of the legislature begins with the text of the statute.' " *Adamson v. Correctional Medical Svcs., Inc.,* 359 Md. 238, 251, 753 A.2d 501 (2000) (quoting *Huffman v. State,* 356 Md. 622, 628, 741 A.2d 1088 (1999)). " '[I]f the plain meaning of the statutory language is clear and unambiguous, and consistent with both the broad purposes of the legislation, and the specific purpose of the provision being interpreted, our inquiry is at an end.' " *Thomas v. Dep't of Labor, Licensing, and Regulation,* 170 Md.App. 650, 659, 908 A.2d 99 (2006) (quoting *Breitenbach v. N.B. Handy Co.,* 366 Md. 467, 473, 784 A.2d 569 (2001)). *See also Adamson,* 359 Md. at 251, 753 A.2d 501 (and cases cited therein)(if legislature's intentions are evident from text of statute, inquiry will cease and plain meaning of statute will govern).

"Where the statutory language is plain and unambiguous, a court may neither add nor delete language so as to 'reflect an intent not evidenced in that language.' " *Chesapeake & Potomac Telephone Co. v. Director of Finance for Mayor and City Council of Baltimore,* 343 Md. 567, 579, 683 A.2d 512 (1995) (quoting *Condon v. State,* 332 Md. 481, 491, 632 A.2d 753 (1993)). We will avoid constructions that are "illogical, unreasonable, or inconsistent with common sense." *Frost v. State,* 336 Md. 125, 137, 647 A.2d 106 (1994). Moreover, we will not

engage " 'in a forced or subtle interpretation in an attempt to extend or limit the statute's meaning.' " *Nesbit v. GEICO*, 382 Md. 65, 76, 854 A.2d 879 (2004) (quoting *Taylor v. Nations-Bank*, 365 Md. 166, 181, 776 A.2d 645 (2001)).

"We bear in mind, however, that the plain meaning rule is elastic, rather than cast in stone." *Adamson*, 359 Md. at 251, 753 A.2d 501 (citing *Kaczorowski v. Mayor of Baltimore*, 309 Md. 505, 513, 525 A.2d 628 (1987)). "If persuasive evidence exists outside the plain text of the statute, we do not turn a blind eye to it." *Id.* We may consider the context in which the statute appears, related statutes, legislative history and other sources for a more complete understanding of what the General Assembly intended when it enacted particular legislation. *Id.*; *Ridge Heating, Air Conditioning & Plumbing v. Brennen*, 366 Md. 336, 350–51, 783 A.2d 691 (2001). "We may also consider the particular problem or problems the legislature was addressing, and the objective it sought to attain." *Sinai Hosp. of Baltimore, Inc. v. Dep't of Employment and Training*, 309 Md. 28, 40, 522 A.2d 382 (1987). "This enables us to put the statute in controversy in its proper context and thereby avoid unreasonable or illogical results that defy common sense." *Adamson*, 359 Md. at 252, 753 A.2d 501.

We begin our analysis with the statutory language of RP § 10–301, which provides:

(a) *When required.*—If in connection with the sale and purchase of a new single-family residential unit which is not completed at the time of contracting the sale, the vendor or builder obligates the purchaser to pay and the vender or builder receives any sum of money before completion of the unit and grant of the realty to the purchaser, the builder or vendor shall:

(1) Deposit or hold the sum in an escrow account segregated from all other funds of the vendor or builder to assure the return of the sum to the purchaser in the event the purchaser becomes entitled to a return of the sum;

(2) Obtain and maintain a corporate surety bond in the form and in the amounts set forth in § 10–302 of this

subtitle, conditioned on the return of the sum to the purchaser in the event the purchaser becomes entitled to the return of the money; or

(3) Obtain and maintain an irrevocable letter of credit issued by a Maryland bank in the form and in the amounts set forth in § 10–303 of this subtitle.

(b) *Maintenance until certain events.*—The vendor or builder shall maintain the escrow account, surety bond, or irrevocable letter of credit until the happening of the earlier of:

(1) The granting of a deed to the property on which the residential unit is located to the purchaser;

(2) The return of the sum of money to the purchaser; or

(3) The forfeiture of the sum by the purchaser, under the terms of the contract of sale relating to the purchase of the residential unit.

■ The plain language of the statute clearly shows that the legislature intended to protect purchasers in certain transactions involving new residential units from unscrupulous vendors and builders who might take payments, such as deposits, made prior to a conveyance. The type of conveyance covered by the statute, however, is ambiguous. In the transactions involved in the instant case, the new single-family residential units were not completed at the time the sales were contracted and, therefore, the transactions arguably fall within the statutory provisions. However, the statute's reference to a new single-family residential unit which is not completed at the time of contracting the sale and, to a purchaser's payment of money "before completion of the unit and grant of the realty," arguably suggests that the statute applies to instances where construction of the unit has, in some way, begun at the time the parties enter into the contract. In addition, the statute's mandate that the escrow account be maintained until the "granting of the deed to the property on which the residential unit is located" suggests that the statute anticipates a transaction where the deed to the land is conveyed after the residen-

tial unit is constructed, and that the land and the residential unit would be conveyed simultaneously to a purchaser.

That interpretation is supported by the fact that the Deposits on New Homes subtitle does not address the payments for labor and materials that are made in accordance with a draw schedule in construction loan transactions such as those at issue in the instant case. In addition, we note that RP § 10–304 provides an exemption from the provisions of the Deposits on New Homes subtitle for

> a sale by or through a licensed real estate broker in connection with which all sums of money in the nature of deposits, escrow money, or binder money are paid to a broker to be held in the escrow account of the broker.

This exemption makes sense because, when money in the nature of deposits, escrow money, or binder money are paid to a licensed real estate broker, the risk that an unscrupulous vendor or builder might take it is eliminated. Noticeably absent from this provision, however, is any reference to construction loan situations, where construction loan amounts might be available to a builder through a draw schedule. Such issues were specifically addressed by the legislature when, in 1986, it enacted the Maryland Custom Home Protection Act (MCHPA), RP § 10–501 *et seq.* The MCHPA requires, with certain exceptions, that all consideration received by a custom home builder from a buyer in connection with the performance of a custom home contract be placed into an escrow account, "to the extent that the consideration is a payment in advance of the completion of the labor or the receipt of the materials for which the consideration is paid." RP § 10–504(a)(1). Section 10–504(b) specifically details the circumstances under which a custom home builder may make withdrawals from an escrow account and § 10–504(e) further provides that the escrow account requirements do not apply in the following transaction:

> (1) A custom home contract financed by a mortgage loan issued by a federally chartered financial institution or a

financial institution regulated under the Financial Institutions Article; and

(2) A sale by or through a licensed real estate broker in connection with which all sums of money in the nature of deposits, escrow money, or binder money are paid to a broker to be held in the escrow account of the broker.

As with the Deposits on New Homes subtitle, the intent of the legislature in enacting the MCHPA was clearly to protect custom home purchasers from unscrupulous custom home contractors. *See Schwartz v. State,* 103 Md.App. 378, 653 A.2d 958 (1995), *cert. denied,* 339 Md. 168, 661 A.2d 701 (1995) (the MCHPA provides a specific remedy for custom home owners dealing with impecunious contractors). Nevertheless, as we have already noted, a custom home builder is only obligated to deposit funds in an escrow account "to the extent that the consideration is a payment in advance of the completion of the labor or the receipt of the materials for which the consideration is paid" because that is, obviously, the money that the statute was designed to protect. That is also why the escrow requirements do not apply to custom home contracts financed by a mortgage loan issued by a federally chartered financial institution or a financial institution regulated under the Financial Institutions Article, or to sales by or through a licensed real estate broker in connection with which all sums of money in the nature of deposits, escrow money, or binder money are paid to a broker to be held in the escrow account of the broker. In those instances, the funds of the custom home purchaser are already protected.

In the case before us, the transactions at issue did not involve situations in which the land and a new single-family residential unit would be conveyed simultaneously to each purchaser, such as was contemplated by the legislature in RP § 10–301. Rather, the contracts specifically identified the portion of the purchase price allocated to the purchase of the lot and, at the settlement on the construction loans, each purchaser received the deed to his or her lot, with construction of the homes in the subdivision to occur at a later date. In the underlying transactions, once the land was conveyed to

the purchasers, they were not in need of the protections afforded by an escrow account maintained by the vendor or builder because each purchaser had obtained a construction loan that provided for a construction escrow and draw schedule. As no construction work was ever done, no draws were made against any of the purchasers' construction escrow accounts. It would seem a logical assumption that, if construction work had been done and OIG received a draw from the construction escrow, it would have been able to use those funds to pay its subcontractors, suppliers and the like. But such provisions are not included in the Deposits on New Homes subtitle because it does not contemplate such a situation. The statute simply was not designed to address a transaction involving the sale of a single-family residential unit and a lot that are not conveyed simultaneously.

■ The case before us involves considerable evidence of underlying contracts and breaches thereof. It is important to remember, however, that this is a criminal matter and that the Deposits on New Homes subtitle includes a penal provision. It is a fundamental principle that "penal statutes are to be strictly construed" and we interpret them narrowly so as not to extend the punishment to cases not plainly within the language used. *Ishola v. State*, 404 Md. 155, 162, 945 A.2d 1273 (2008). The Court of Appeals has explained the rationale behind this fundamental rule of construction as follows:

> The rule that penal laws are to be construed strictly, is, perhaps, not much less old than construction itself. It is founded on the tenderness of the law for the rights of individuals; and on the plain principle that the power of punishment is vested in the legislative, not in the judicial department.... To determine that a case is within the intention of a statute, its language must authorize us to say so. It would be dangerous, indeed, to carry the principle, that a case which is within the reason or mischief of a statute, is within its provisions, so far as to punish a crime not enumerated in the statute, because of its equal atrocity or of kindred character, with those which are enumerated.

*Farris v. State,* 351 Md. 24, 36, 716 A.2d 237 (1998) (quoting *U.S. v. Wiltberger,* 18 U.S. (5 Wheat) 76, 95–96, 5 L.Ed. 37 (1820), *superseded by statute,* 1999 Md. Laws, Chap. 422, *as recognized in Boffen v. State,* 372 Md. 724, 742–43, 816 A.2d 88 (2003)).

Because it is ambiguous as to whether the Deposits on New Homes subtitle applies to the type of transactions at issue in this case, the rule of strict construction requires that we resolve that ambiguity against the State and in favor of appellant. Furthermore, we believe this result is consistent with the legislative intent. The purpose of the subtitle, the structure of the statutes and other similar statutory provisions all indicate that the General Assembly did not intend to include within the coverage of the Deposits on New Homes subtitle, construction loan transactions where the land and the new residential unit are not conveyed simultaneously. We hold, therefore, that the evidence was insufficient to sustain appellant's convictions under the Deposits on New Homes subtitle.

## II

Appellant next contends that he was improperly prosecuted for theft by deception when the more specific criminal provisions of RP § 10–301 *et seq.,* the "Deposits on New Homes" statutes, were operative. In light of our holding on the first issue presented, we need not reach this issue.

## III

Appellant next contends that the evidence was insufficient to sustain his convictions for theft by deception under § 7–104 of the Criminal Law Article (CL). The standard for reviewing the sufficiency of the evidence is "whether, after considering the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia,* 443 U.S. 307, 313, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); *Allen v. State,* 402 Md. 59, 71, 935 A.2d

421 (2007) (quoting *Rivers v. State*, 393 Md. 569, 580, 903 A.2d 908 (2006)). We give "due regard to the [fact-finder's] findings of facts, its resolution of conflicting evidence, and, significantly, its opportunity to observe and assess the credibility of witnesses." *Harrison v. State*, 382 Md. 477, 488, 855 A.2d 1220 (2004) (citing *McDonald v. State*, 347 Md. 452, 474, 701 A.2d 675 (1997), *cert. denied*, 522 U.S. 1151, 118 S.Ct. 1173, 140 L.Ed.2d 182 (1998)). In performing its function, the jury is free to accept the evidence it believes and reject that which it does not believe. *Muir v. State*, 64 Md.App. 648, 654, 498 A.2d 666 (1985). When reviewing a challenge to the sufficiency of the evidence, we "view the evidence, and all inferences fairly deducible from the evidence, in a light most favorable to the State." *Hackley v. State*, 389 Md. 387, 389, 885 A.2d 816 (2005) (citations omitted).

In support of his contention that the evidence was insufficient to sustain his convictions for theft by deception, appellant argues that the State failed to prove beyond a reasonable doubt that OIG did not provide value for the money it received because the appraisal of the estimated value of the lots was equal to or in excess of the agreed purchase price. In addition, appellant asserts that the money received by OIG constituted deposits or payments for blueprints and plans, and all of that money was refunded or refundable upon request. Appellant further asserts that the evidence presented at trial in support of his conviction for theft by deception established, at best, negligence, breach of contract or a finding that OIG was underfunded and understaffed. Relying on *Schwartz v. State*, 103 Md.App. 378, 653 A.2d 958 (1995), appellant claims that the evidence presented at trial established nothing more than his "unexcused failure to render a promised performance when it is due [which] is always a breach of contract." *Id.*

In *Schwartz*, the defendant, Lisa Schwartz, was convicted of two counts of theft and two counts of misappropriation by a fiduciary. *Id.* at 380, 653 A.2d 958. Schwartz managed the day-to-day affairs of Adams Homes, Inc., and her duties included paying bills and deciding what checks to issue. The

bank accounts of both Adams Homes, Inc. and Schwartz were repeatedly overdrawn. *Id.* at 381, 653 A.2d 958.

Adams Homes, Inc. contracted with two couples, the Blakes and the Romans, for the construction of two single-family modular homes to be built on property owned by each couple. *Id.* Schwartz signed all of the contract documents between Adams Homes, Inc. and the couples, controlled the funds they deposited pursuant to their contracts, and directed and controlled the construction of the two homes. *Id.* at 381–82, 653 A.2d 958. Schwartz failed to deposit the funds paid to Adams Homes, Inc. by the couples in an escrow account, as required by RP § 10–502, a provision of the MCHPA that required "[a]ny consideration received by a custom home builder in connection with a custom home contract" to be "held in trust for the benefit of the buyer."

As a result of continued delays in the completion of their home, the Romans did not pay their final draw, terminated their contract and completed the construction of their home themselves. They did not, however, complete the construction of their garage. Schwartz testified at trial that all of the materials for the garage had been purchased and stored at a warehouse by Adams Homes, Inc. at the time the Romans terminated their contract. *Id.* at 384, 653 A.2d 958.

The Blakes also terminated their contract and completed the construction themselves. *Id.* The Blakes claimed that Adams Homes, Inc. failed to provide a chimney, basement windows and an exterior door and the trial court agreed. Schwartz was convicted of theft and misappropriation of funds by a fiduciary under Md. Ann.Code (1992), Art. 27, § 132 for failure to deliver and construct the items identified by the Romans and Blakes or otherwise hold the money for those items in escrow. *Id.* at 385, 653 A.2d 958.

On appeal, we considered, *inter alia,* whether Schwartz could be convicted of theft and misappropriation of funds by a fiduciary. Schwartz argued that her relationships with the Romans and the Blakes were purely contractual, not fiduciary. The State argued that RP § 10–502 imposed a fiduciary duty

upon Schwartz and, therefore, she could be charged with misappropriation of funds by a fiduciary under § 132. We agreed with Schwartz that she was not a fiduciary, within the meaning of § 132 and, therefore, her conviction under that section was reversed. In reaching that conclusion, we recognized that any failure by Adams Homes, Inc. to complete the work pursuant to the buyers' custom home contracts logically results in an action for breach of contract and, perhaps, a violation of the MCHPA, which provides "a specific remedy for custom home owners dealing with impecunious contractors." *Id.* at 389, 653 A.2d 958. As the legislature provided a comprehensive remedial scheme for MCHPA violations, which it intended to be an exclusive remedy and a specific penalty for custom home builders who violate the statutorily created trust relationship between the builder and the purchaser, a custom home builder "may not be punished under § 132 merely because she disobeyed certain provisions of the MCHPA." *Id.* We recognized, however, that Schwartz was not charged with violating the MCHPA.

In addition, we held that the State failed to prove that Schwartz was guilty of theft of goods over $300, under Md. Ann.Code (1982), Art. 27, § 342, for failing to turn over the construction materials for the Romans' garage or build the Blakes' chimney and install their windows and door. *Id.* at 391, 653 A.2d 958. In reaching that conclusion, we noted that "the unexcused failure of a contractor to render a promised performance when it is due is always a breach of contract," and there was no evidence presented at trial to demonstrate that Schwartz exerted unauthorized control over the materials purchased to construct the Romans' garage, nor was there any explanation as to "how Adams Homes' failure to perform its contract obligations to construct the Blakes' chimney and install their windows and exterior door constitutes theft." *Id.* at 393, 653 A.2d 958. We concluded:

> Principles of criminal law are inapplicable to the problems arising out of these contractual disputes. If we were to permit the State to charge an impecunious contractor under the theft statute because the contractor failed to perform

contract obligations adequately, each breach of contract could conceivably result in criminal charges against the contractor for theft. 'Whenever parties themselves define the limits of their rights and obligations, the compact controls, and there is no room for the application of a legal theory to the contrary.' In the instant case, the Romans and the Blakes agreed to pay Adams Homes to construct custom homes on their properties. Adams Homes, in return for a certain sum of money, agreed to construct the homes and complete the work in accordance with an agreed upon schedule of draw payments. Any failure on the parts of Adams Homes or appellant to perform under the Blake and Roman contracts resulted in breaches of those contracts and possible violations of the MCHPA. Such failures to perform contractual obligations, however, should not have resulted in appellant's conviction for theft.

After considering all of the evidence in a light most favorable to the prosecution, we hold that no rational trier of fact could have found the essential elements of embezzlement or theft beyond a reasonable doubt. Accordingly, we reverse appellant's convictions for misappropriation of funds (§ 132) and theft for goods over $300 (§ 342).

*Id.* at 393, 653 A.2d 958 (internal quotations omitted).

In the case at hand, we find the reasoning of *Schwartz* persuasive. The record before us contains ample evidence of appellant's incompetence as a builder and his failure to perform contractual obligations adequately. Certainly, any failure on the part of appellant to perform under the contracts resulted in breaches of those contracts, but those breaches did not warrant appellant's conviction for theft. Principles of criminal law are simply inapplicable to the instant case, which arises out of appellant's failure to perform under his contracts with the purchasers.

Nevertheless, the State argues that the instant case differs from *Schwartz* because appellant was not charged with theft of construction materials, but rather theft by deception. Even assuming that the manner in which the theft was committed

allows a breach of contract to give rise to a criminal action, we conclude that, under the facts before us, the State failed to prove beyond a reasonable doubt that appellant had the intent to deceive the purchasers necessary to sustain a conviction for theft by deception.

The legislature created the theft statute, CL § 7–101 *et seq.*, to consolidate, in a single statutory scheme, the various common law larceny related crimes. *State v. Burroughs,* 333 Md. 614, 636 A.2d 1009 (1994). Prior to the enactment of the consolidated theft statute, larceny, receiving stolen goods and related theft offenses were delineated under separate criminal statutes. Maryland's theft statute provides several theories requiring the State to prove different elements under which an accused can be charged. In the case at hand, appellant was charged with, and convicted of, theft under § .7–104 of the Criminal Law Article. The State maintained at trial, as it does on appeal, that appellant was guilty of theft by deception, pursuant to § 7–104(b), which provides:

(b) *Unauthorized control over property—By deception.*—A person may not obtain control over property by willfully or knowingly using deception, if the person:

(1) intends to deprive the owner of the property;

(2) willfully or knowingly uses, conceals, or abandons the property in a manner that deprives the owner of the property; or

(3) uses, conceals, or abandons the property knowing the use, concealment, or abandonment probably will deprive the owner of the property.

Section 7–101(b) sets forth the following eight methods of deception:

(1) "Deception" means knowingly to:

(i) create or confirm in another a false impression that the offender does not believe to be true;

(ii) fail to correct a false impression that the offender previously has created or confirmed;

(iii) prevent another from acquiring information pertinent to the disposition of the property involved;

(iv) sell or otherwise transfer or encumber property without disclosing a lien, adverse claim, or other legal impediment to the enjoyment of the property, regardless of whether the impediment is of value or a matter of official record;

(v) insert or deposit a slug in a vending machine;

(vi) remove or alter a label or price tag;

(vii) promise performance that the offender does not intend to perform or knows will not be performed; or

(viii) misrepresent the value of a motor vehicle offered for sale by tampering or interfering with its odometer, or by disconnecting, resetting, or altering its odometer with the intent to change the mileage indicated.

■ In order to prove that appellant committed theft by deception, the State bore the burden of proving that appellant had the intent to deceive. Theft by deception requires proof of the offender's intent to mislead, but not proof that the victim was misled. *Fraidin v. State,* 85 Md.App. 231, 259, 583 A.2d 1065 (1991). Intent has been defined as "the exercise of intelligent will, the mind being fully aware of the nature and consequences of the act that is about to be done with such knowledge and liberty of action, willingly and electing to do it." *Nance v. State,* 7 Md.App. 433, 445, 256 A.2d 377 (1969).

The State asserts that the purchasers bargained with appellant for habitable homes in a finished subdivision—not blueprints, refunds or title to land that could not be developed except at great additional expense. Instead of delivering his end of the bargain, appellant, without any intention or ability to create infrastructure for the development, or to build the houses for which the buyers had contracted, willfully and knowingly used deception with the intent to obtain money from them. According to the State, even if appellant started the project in good faith, he failed to notify the purchasers when he found out the project could not proceed as planned, failed to correct the false impressions he created, promised performance that he knew could not be made and failed to

disclose his inability to obtain permits for building in a flood plain except at great additional cost.

According to the State, appellant committed theft by deception in a number of ways. First, he falsely told several buyers that he had been building houses for years and either took them or sent them to visit homes, creating the impression that he was the builder of those homes when, in fact, he was not. Only one purchaser, Abimbola Adinlewa, testified that she had no reason to think that appellant had not built the homes he showed her, but she later "found out that [appellant] hadn't built those homes." Adinlewa did not testify when or how she learned that appellant had not built those homes, nor did she testify as to who actually built those homes. There was simply no evidence to show whether appellant had any role in building the homes he showed or sent the purchasers to visit. In addition, except for the fact that OIG registered as a homebuilder in the State of Maryland just prior to the time the contracts were entered, the record before us is devoid of any evidence pertaining to appellant's experience as a home builder.

The State further argues that appellant showed many of the purchasers drawings and floor plans stamped "OIG" that he represented as his company's own, when, in fact, they had been taken without authorization from another company. The evidence presented at trial showed that Jennifer Lewis–Gooden furnished her own floor plans and the floor plans shown to another purchaser, Rana Johnson, contained an indication that they belonged to a homebuilder other than OIG. Timothy Gough, part owner of a residential homebuilding company, NDI Homes of Maryland, testified that his company's renderings and floor plans are not available for anyone to use unless they have permission. Gough identified several renderings that had been shown to Kings Grant purchasers as belonging to his company, although they had OIG's name printed on them. Gough testified that neither appellant nor OIG had permission to use NDI's plans, but he acknowledged that NDI had obtained the plans from someone else and that appellant could have obtained approval to use the renderings and floor

plans from the person who made them. The State failed to offer any evidence that appellant did not have permission to use the plans. Moreover, the evidence established that OIG eventually had the plans converted into blueprints and other architectural drawings by MDB.

The State also argues that appellant promised that he could build the houses in 180 days or less, did not disclose to purchasers any problems that might cause delay and represented that he had already applied for some permits and would receive them within two months. Only one purchaser, Stuart Thompson, testified that appellant told him that "permits already had been applied for," while other purchasers testified that appellant intended to "pull the permits." The record is devoid of evidence that appellant did not believe his reported timetables to be true. To the contrary, it was undisputed that the Maryland Department of the Environment issued a permit for construction activity for the subdivision, although James Reid, President and CEO of Civtech, testified that that permit had "no weight as far as the development of the subdivision whatsoever," because approval from Prince George's County would still be required to move forward with grading and other things within the flood plain and wetland areas. In addition, Barnes testified that a woman named Elizabeth had been retained by appellant to process permits. Barnes also testified that she retained engineers who filed with Prince George's County a storm water concept plan, received comments from Prince George's County on the plan and responded to them.

The State also contends that appellant "hid from the buyers the fact that the lots were virtually not buildable because of the flood plain issues." As appellant points out, there was no evidence that the property was not buildable because of the flood plain issues. William Brenner, a senior vice president for First Mariner Bank, testified that the flood plain easements on the plat were a concern for the bank, but, just because a property is in a flood zone, does not mean it is not a buildable lot. According to Brenner, it might mean only that flood insurance is required. Steve Gaskins also testified that

flood plain lines can be mitigated and that there appeared to be good feasibility for development of the Kings Grant subdivision if the one hundred year flood plain was realigned and certain plan requirements were met.

In attempting to show appellant's intent to deceive, the State also relies on the fact that, even after appellant was advised by Civtech that it would take at least a year and more than $100,000 to develop the property, he continued to send communications to the purchasers in which he falsely and deceptively represented that permits had been initiated, he had contracted with professionals to do the work and that he would complete the homes as promised. In addition, the State argues that, "because Civtech's services were $100,000 alone, [appellant] knew from the start that he could not build a subdivision with only the funds he received from the buyers." Even assuming that these acts were deceptive, it is undisputed that appellant obtained information from Civtech after the purchasers had gone to settlement. The alleged thefts were committed, however, when appellant obtained or exerted unauthorized control over the property of the purchasers by deception with the intention to deprive them of the property. That occurred, at the latest, at the time of the last settlement on August 30, 2004. Because the only money alleged to have been stolen from the purchasers was taken at or before the date of the settlements, facts occurring after the date of the settlement do not permit a proper inference of intent at the time of the theft.

For all of these reasons, we conclude that the evidence was insufficient to establish that appellant had the requisite intent to deceive.

### IV and V

In light of our holding, we need not reach the issues pertaining to the testimony of the Assistant Attorney General or the propriety of the restitution order.

**JUDGMENT OF THE CIRCUIT COURT FOR PRINCE GEORGE'S COUNTY REVERSED.**

COSTS TO BE PAID BY PRINCE GEORGE'S COUNTY.