69 A.3d 1186

Kirk **ALBERTSON**

v.

**STATE of Maryland.**

No. 2583, Sept. Term, 2011.

Court of Special Appeals of Maryland.

June 27, 2013.

Robert A. Thornton, Jr., Denton, MD, for Appellant.

Jessica V. Carter (Douglas F. Gansler, Attorney General, on the brief), Baltimore, MD, for Appellee.

Panel: WRIGHT, BERGER, JAMES R. EYLER, (Retired, Specially Assigned) JJ.

JAMES R. EYLER, J.

Appellant, Kirk Albertson, was charged in the Circuit Court for Talbot County, Maryland, with theft scheme, multiple counts of passing bad checks which were dishonored for insufficient funds and stop payment orders, and multiple counts of theft over $500. After a jury trial, appellant was convicted of four counts of passing bad checks in violation of Section 8–103(a) of the Criminal Law Article, and three counts of passing bad checks in violation of Section 8–103(b). Appellant was sentenced to seven concurrent terms of eighteen months, with twelve months suspended on each count, for an

aggregate unsuspended sentence of six months. He was also ordered to pay restitution and was placed on supervised probation for five years. Appellant timely appealed and, rephrased and reordered, presents the following questions for our review:

1. Did the trial court err in declining to give a jury instruction that explained the difference between a civil cause of action and a criminal charge for passing a bad check based on insufficient funds?

2. Was the evidence insufficient to sustain appellant's convictions for violations of Sections 8–103(a) and 8–103(b) of the Criminal Law Article?

For the following reasons, we agree that there was error in instructing the jury as to the four counts under Section 8–103(a). We also agree that the evidence was insufficient to sustain the convictions under those counts. The judgments are otherwise affirmed.

## BACKGROUND

*State's Case–In–Chief*

This case concerns the business dealings between the victim, Ed Scherl, a licensed auto-broker, and Rokabil Motors LLC ("Rokabil"), a retail used car dealership owned by appellant and William Haddaway.[1] Scherl's role was to provide Rokabil with used cars that Rokabil would then place on its lot for sale to the general public, including to persons with poor or no credit. When a car sale was made, Scherl would deliver title to said vehicle to Rokabil, in exchange for a check in the amount of the sale.

Scherl testified that, when he received checks in exchange for title to the cars, he would collect them and deposit them between one and ten days after the transfer. After certain checks started bouncing, Scherl went directly to Rokabil's

---

1. The name of appellant's company, Rokabil Motors, is spelled various ways throughout the transcript. We shall adopt the spelling used on the notarized exhibits admitted at trial.

bank, Talbot Bank, where he learned that the checks were not "any good." Scherl testified that appellant or Haddaway normally signed the checks, and that Carol Northcut, an employee of Rokabil, would sometimes sign paperwork associated with the transfer of the vehicles.

A bank representative from Talbot Bank, Wanda Hutchinson, testified that appellant and Haddaway had signature authority for the Rokabil bank account. Referring to certificates of dishonor for the pertinent checks, Hutchinson explained that a check is "uttered" on the day it is written, and is "presented" when it comes to the bank for payment. Hutchinson then addressed the first four checks at issue in this appeal, testifying to the check number, the amount, the day the check was uttered (issued), the amount of funds available on that day, the day the check was presented for payment, and the amount of funds available on the date of presentment. According to Scherl, the checks were signed and delivered to him by appellant in appellant's office.[2] Looking to both Hutchinson's and Scherl's testimony at trial, the following table details the relevant figures for these four checks, including the vehicles associated with these checks:

| Count | Vehicle | Check No. | Uttered | Amount | Opening Balance | Closing Balance | High Balance |
|-------|---------|-----------|---------|--------|-----------------|-----------------|--------------|
| 10 | Mazda Protege | 2568 | 09/22/09 | $2,675.00 | $3,845.33 | $3,725.33 | $3,845.33 |
| 12 | Pontiac Bonneville | 2582 | 09/28/09 | $3,300.00 | $297.07 overdrawn | $8,875.14 | $8,875.14 |
| 14 | Saturn | 2583 | 09/28/09 | $2,650.00 | $297.07 overdrawn | $8,875.14 | $8,875.14 |
| 16 | Nissan Altima | 2584 | 09/28/09 | $3,250.00 | $297.07 overdrawn | $8,875.14 | $8,875 14 |

Thereafter, all four of the checks were presented on the same day, November 3, 2009, notably more than thirty days after they were uttered. On that day, these four checks were

**2.** There was testimony that, the day after three of these checks were uttered, September 29, 2009, two unrelated checks were presented and paid, one of which was payable to Scherl. By the close of business on September 29, 2009, Rokabil's account was overdrawn in the amount of $7,287.71.

all dishonored for insufficient funds ("ISF"). The Rokabil account was overdrawn by $159.09 at opening, the high balance for the day; at closing, the account was ultimately overdrawn by $579.08. Scherl testified at trial that he received neither the money due for these four vehicles, nor the return of the vehicles themselves.

A representative from Queenstown Bank of Maryland, Heather Jarrell, testified to the remaining three checks at issue. Jarrell testified that a new bank account in the name of William Haddaway doing business as RMC Holdings was opened on October 5, 2009, with a $75.00 deposit. By the end of October, the balance had increased to $1,305.00.

Pertinent to our discussion, Jarrell testified that three checks, all payable to Scherl, were ultimately dishonored and not paid due to the placement of stop payment orders. ("SPO"). Scherl testified at trial that these checks were signed by appellant at Rokabil Motors. Scherl also explained that these checks were purportedly to replace three checks from the Talbot Bank account that were given by Rokabil in exchange for the transfer of title of three vehicles different from those listed above:

| Count | Vehicle | Check | Uttered | Amount | Replaces Talbot Bank Check No. | Queenstown Bank Balance |
|-------|---------|-------|---------|--------|-------------------------------|-------------------------|
| 18 | Honda Civic | 1001 | 10/09/09 | $5,500.00 | 2515 | $75.00 |
| 22 | Ford Ranger | 1003 | 10/09/09 | $3,600.00 | 2516 | $75.00 |
| 24 | Dodge Caravan | 1004 | 10/09/09 | $3,100.00 | 2489 | $75.00 |

A stop payment was ordered on these three Queenstown Bank checks on October 19, 2009. There is no indication in the record who ordered the stop payment. The checks were then dishonored when presented on October 23, 2009. Scherl testified that he did not receive payment or the return of these three vehicles.

*Initial Argument on Motion for Judgment of Acquittal*

At the end of the State's case-in-chief, defense counsel generally argued that there was insufficient evidence of identification of who was responsible for drafting the bad checks in

this case. The court ruled that there was sufficient evidence of appellant's involvement in the business and denied the motion.

The court then went through the charged counts individually, but we address only the counts for which the jury returned convictions. As to Count 10, concerning the Mazda, after the State argued that there was testimony that appellant signed the check, the court denied the motion. On Count 12, the Pontiac, defense counsel conceded that appellant signed the check, and the court denied the motion. Defense counsel made no specific argument on either Count 14, the Saturn, or Count 16, the Nissan, and the court denied the motions.

As for the replacement checks for the three remaining vehicles, on Count 18, the Honda, and on Count 22, the Ford, defense counsel made no additional argument, and the court denied the motions. As for Count 24, the Dodge, defense counsel simply noted that the court had granted the motion for the count charging uttering a bad check initially from the Talbot account, and the court then denied the motion for the count concerning issuance of the replacement check for this vehicle. No further argument was made on the motions at the end of the State's case-in-chief.

*Defense Case*

Pertinent to our discussion, Carol Northcut was an employee of Rokabil and knew that Scherl was a wholesaler that provided cars for Rokabil to sell. Northcut's understanding of the arrangement between Rokabil and Scherl was that "[Rokabil] Motors would give Ed Scherl a check for whatever car that we had sold and Ed was supposed to hold the check until he was given an okay by either Kirk [Albertson] or Bill [Haddaway]." Sometimes Scherl would call and ask Northcut to ask appellant whether he could cash certain checks. Northcut denied that she ever signed checks to Scherl, and testified that appellant kept the books and the checkbook register.

Northcut further explained that Rokabil used a bank called Credit Acceptance Corporation ("CAC") to help customers finance the purchase of vehicles provided by Scherl. When a

customer obtained a loan for a vehicle, CAC paid Rokabil a certain percentage of the loan amount. Northcut then testified that, after a vehicle was sold, Scherl would sign over the title to an employee of Rokabil.

On cross-examination, Northcut provided further details, testifying that Scherl was the only person providing cars for resale to Rokabil. Scherl would pass title to Rokabil, and then Rokabil would retitle the car to the individual purchaser. With respect to the manner in which Scherl was to be paid, Northcut then testified that she "knew it was fact that Mr. Scherl was supposed to hold the checks." Northcut confirmed that appellant signed the seven checks at issue in this appeal.

On redirect examination, Northcut maintained that Scherl was supposed to hold the checks, explaining that "on some of the cars it was because we were waiting for funding from the bank." Northcut testified that when funding came through, she would inform appellant. She also indicated that there was "no set system for when we gave [Scherl] a check," and that appellant and Haddaway were the only ones who could sign a check to Scherl. Northcut concluded by testifying that Scherl was given a check "about 50 to 60 percent of the time" on the same day he delivered title.

Appellant testified on his own behalf and explained the arrangement between Rokabil and Scherl as follows:

We did discuss a business deal. Ed Scherl was going to provide us with as many cars as we needed, which I believe he said the number would be 40, which would keep our lot full all the time. When we sold a car he would give us a title and we would pay for the car. Bill and I both explained to Ed Scherl that our dealership was not in a position to pay cash, as would be known as cash at the time we sold the car. We would have to wait for a few other actions to transpire before we could pay the car off. Ed Scherl said that that wouldn't be a problem. Just give me a check and I will hold it and when you had enough money to make that check good I would go to the bank and deposit that check. I reiterated with Ed Scherl that I felt a little

uncomfortable with writing a check that he would hold. Ed Scherl promised us and assured us that he would not present the check to the bank unless we approved that check to be presented to the bank. He would hold it until we had the money to cover the check.

Appellant explained that the reason Rokabil did not have the money to pay for the car immediately was due to the fact that many of their customers had poor credit. Because of the need for these customers to obtain financing, Rokabil would often not be paid by CAC until 15 to 30 days after the sale. Rokabil received hold checks and promissory notes from its customers as down payment for the sale of the vehicles. Appellant testified that Scherl was aware of this relationship with CAC and knew that it sometimes took between several weeks and a month before Rokabil would receive money for the sale of the vehicles. Appellant further testified that Scherl had been in the car business for over thirty years and was very familiar with the process of collecting money from CAC. Scherl was the only wholesaler that Rokabil worked with. Appellant agreed that he would sign checks to Scherl on occasion.

Appellant further explained that, after a sale, it could take anywhere between three to five days and 45 to 90 days before Rokabil received payment from the customer or CAC. At some point in October 2009, this delay began to bother Scherl. Appellant testified that some of the sales were problematic and that Rokabil could not make those checks to Scherl good. After explaining this problem to Scherl, Scherl decided to have a tow truck come to Rokabil's lot in order to remove his vehicles from the premises.

On cross-examination, appellant agreed that he had signing authority for the checks to Scherl, and that he, appellant, had access to the checking account balance. He also confirmed that he signed all the checks at issue in this case, except for check number 2568, the one for $2,675.00 for a Mazda Protege. As for the hold check agreement, appellant asserted that Scherl had "a very disorganized way of doing things." Appel-

lant claimed that he would tell Scherl certain checks could be cashed, and that Scherl, at times, would cash different checks.

Appellant also explained the process of how customers obtained financing from CAC. Starting with the premise that "[e]veryone is approved," Rokabil would forward all the pertinent information to CAC regarding a car sale, and that CAC would then decide how much money it would advance to Rokabil for said vehicle. CAC would hold the balance on the sale until it received payment from the customer on the loan. After a certain period, CAC would pay Rokabil any balance due.

Appellant clarified that Scherl would bring cars to the lot and tell appellant how much he expected to be paid for that car. Rokabil would then try to sell the car to a customer for a profit. Appellant explained that, after the customer put down a down payment and drove the car off the lot, the financing company, CAC, occasionally would not pay the entire amount due for the car up front. Rokabil would be paid eventually as the customer paid down the loan. Appellant agreed, however, that CAC paid Rokabil the full cost of the vehicle most of the time. Appellant maintained that the agreement between Rokabil and Scherl was that Scherl would have to wait a period of time to be paid after he delivered title for the cars, although he confirmed that they did not repeat the terms of that agreement on each transfer.

Upon further cross-examination, appellant testified about the nature of the agreement as follows:

Q. When you wrote and issued those checks and gave them to Mr. Scherl did you know there wasn't enough money in the bank to cover them?

A. No, sir.

Q. You didn't know?

A. That wasn't part of the deal.

Q. Well . . .

A. We agreed that these checks would not have been cashed.

Q. Because there wasn't enough money in the bank to cover them?

A. No. That wasn't our agreement.

Q. But listen to the actual question. When you wrote the check . . .

A. Well I understand what you're trying to get me to say but I can't . . .

BY THE COURT:

Q. Well, sir, sir, wait a minute. Just listen to his question. BY

[PROSECUTOR]:

Q. When you wrote the check was there [sic], I understand that you wanted him to cash it later, but was there enough money in the bank when you wrote the check to cover the check?

A. I don't know.

Q. You don't know?

A. Because I didn't look at the bank account because those checks weren't supposed to be cashed on that day.

Q. Was there ever enough money in the bank to cover those checks?

A. Yes.

Q. When?

A. If some weren't cashed for 30 days there was a fluctuation at time where our checking account was up and down.

Q. Were you out of business by then?

A. No, we didn't go out of business until Ed took all the cars off the lot.

Q. When was that?

A. I believe that was October 24th or October 25th.

Appellant did not know if there was enough money in the Talbot bank account to cover the checks written on September 28, 2009. He also admitted that the high balance in the bank during October was $3,263.00. With respect to the replace-

ment checks written on the Queenstown Bank, replacing checks for three different vehicles, appellant agreed that his partner, Haddaway, opened that account with a $75.00 deposit. Appellant confirmed that he never deposited enough money in the Queenstown Bank to cover the three replacement checks. While admitting he wrote the three checks at issue, appellant claimed he did not order stop payment on those checks. Appellant agreed that Scherl was never paid on the seven cars, and that Rokabil did not return the cars in question. Apparently, the Motor Vehicle Administration ("MVA") eventually required Scherl to pass title to the disputed cars to the owners. Appellant testified that was between the MVA and Scherl. Appellant also agreed that, after Rokabil went out of business, he never paid Scherl any money due on the seven checks.

On redirect examination, appellant testified that it was not his "intent to cheat Ed out of any money, none whatsoever. As a matter of fact Ed was our sole source of being in business." While he did not always check the bank account balance before signing a check, appellant maintained that the agreement with Scherl called for Scherl to "not cash those checks for a period of time." Further, appellant testified that "[t]his whole thing was Ed's idea. It wasn't our idea to write checks and then to hold them." And, "Ed Scherl came up with the idea that if you can't afford to pay for the cars when I give you the titles I'll go ahead and take the hold check."

On recross, appellant admitted that Rokabil had bills due to entities in addition to Scherl. After the prosecutor asked whether there might not be enough money available if other creditors cashed their checks before Scherl on any given day, appellant replied that he was "unaware of that."

*State's Rebuttal*

The State called Scherl in rebuttal and asked him about the purported hold-check agreement. Scherl testified as follows:

A. There were a couple of occasions where they had asked to hold the check up because of funding. Some of it, they were all different. Some were cash deals, the checks

were good right away. There were some deals that were done on local banks, they actually walked the contracts through and got the check from the local banks. So they were fairly quick. And then there were some that went through other lenders that took a week or 10 days to be funded and they would ask for time on those checks.

Q. And did you give them that time?

A. I did.

Q. Now with regard to the checks that are involved today with Mr. Albertson do you recall whether any of those you were asked to wait or not?

A. I can't recall honestly.

Scherl also testified that he did not believe that any of the seven cars involved in this case were ones that became a matter of dispute with the MVA. He agreed, on cross-examination, that he was paid for the majority of the vehicles he delivered that were sold by Rokabil.

*Defense Surrebuttal*

Appellant testified that he never delivered checks to Scherl that were meant to be cashed immediately. Appellant also testified:

The agreement up front was he would hold the checks, we didn't have to ask him to hold a check it was just the way it was right off the bat. He would hold the check until it was time for it to be cashed. We didn't ask, that was his plan.

Appellant disputed Scherl's account regarding the seven vehicles in this case, indicating that Scherl took the titles back for those vehicles, and that the titles were not in appellant's control after that. MVA became involved after this because of concerns from the vehicle buyers and the financing company that the proper paperwork was missing. With respect to the three replacement checks, appellant asserted that Scherl knew not to cash those immediately because "that was included in our whole agreement, yes. Absolutely." Appellant clarified that "I didn't say don't cash them, I said that we'll let you

know when to cash the checks. I don't know the exact conversation."

*Final Argument on Motion for Judgment of Acquittal*

With respect to the first four checks issued on the Talbot Bank account, defense counsel argued that there was no evidence that appellant knew there was insufficient funds to cover those checks. After hearing from the State that the evidence established that there were insufficient funds as early as the very next day after the checks were issued, the court denied the motion. The court stated that "I think the statute is clear there has to be sufficient funds to cover not only the check in question but in any other outstanding checks and obviously when the check was presented there were insufficient funds to do that."

Turning to the three Queenstown Bank checks, referred to as the replacement checks, defense counsel contended there was no evidence that appellant asked for a stop payment order on these checks, or that he even had authority to do so. The State responded that, while there was no evidence as to who asked for the stop payment order, that appellant admitted he wrote these checks and that appellant and Haddaway were both acting together in this case and were equally responsible. The court agreed that the jury could find that appellant and Haddaway were "aiding and abetting one another," and that, because the issue was one for the jury to decide, the court denied the motion.

## DISCUSSION

### I.

We first address appellant's claim of instructional error. In his brief, appellant asserts generally that:

Defense counsel clearly stated the distinction between a civil claim for a bad check and a criminal bad check and that, not every check returned for insufficient funds means the conduct of the drawer is criminal in nature, supporting a conviction for bad check, but may only create a debt where

[the] person to whom the check is payable, has a civil claim against this drawer or maker of the check.

Appellant clarifies this argument further:

Had the Jury been instructed on the difference between a civil breach of contract action and criminal charges, there is a significant possibility that the Jury would have found that a hold-check agreement was in effect for the checks at issue, and the Jury would have acquitted Mr. Albertson of all violations under Section 8–103.

The State responds by asserting that the trial court did not abuse its discretion in denying appellant's requested instructions. The State further asks us not to find error on the grounds that the trial court gave the pattern instructions for the underlying offenses.

We agree that the trial court did not abuse its discretion in denying some of the requested instructions. Nevertheless, because the trial court is ultimately responsible for properly instructing the jury as to the applicable law, we are persuaded that there was error in not instructing the jury that the existence of a hold-check agreement could have negated the intent required to convict appellant of obtaining property or services by passing a bad check.[3]

At trial, after appellant testified on direct examination, counsel and the court discussed defense counsel's proposed

---

**3.** For the first time on appeal, at oral argument, appellant's counsel contended that the trial court committed plain error when it instructed that "[t]here has been placed into evidence a certificate under oath from the bank's representative that the Defendant at the time of issuing the check did not have sufficient funds to cover that check *and other outstanding checks.*" (emphasis added). Counsel argued before this Court that the sworn exhibits did not indicate that the existing balance on the dates in question did not have sufficient funds to cover "outstanding checks." We decline to consider such an argument raised for the first time at oral argument. *See Comptroller of Treasury v. Aerial Prods.*, 210 Md. 627, 645, 124 A.2d 805 (1956) ("The point was not mentioned or argued in the appellee's brief and, not being argued in the appellant's brief, was not mentioned in its oral argument. The question, therefore, is not before us here"); *see also Uninsured Employers' Fund v. Danner*, 388 Md. 649, 664 n. 15, 882 A.2d 271 (2005) (declining to consider argument raised for first time at oral argument).

jury instructions outside the presence of the jury. Relevant to this claim, defense counsel wanted the court to instruct the jury:

"To the extent an obligation is modified, supplemented, or nullified by an agreement, the agreement is a defense to the obligation."

After the court asked defense counsel to explain its rationale for this instruction, counsel responded that it was "out of the commercial law article, Your Honor, on negotiable instruments."[4] The following discussion then ensued:

THE COURT: Well that may be a civil principle of law but what relevance does it have to the criminal law?

[DEFENSE COUNSEL]: Well because we've got an agreement here, Your Honor, that if the check is modified or the decision of the check is modified in any way then that means it's not a negotiable instrument or a check at that point in time that can be named the bad check. It goes along with the general law, Your Honor, and I'm quoting from bad checks and the instructions in the District Court of Maryland.

After attempting to clarify that the source for this information was the District Court, defense counsel continued:

[DEFENSE COUNSEL]: I'm just trying to explain the concept. Well I'm just trying to explain the concept, Your Honor. And that is the concept that is it's either a bad check violation or a breach of contract. In other words

---

4. The requested instruction appears to be derived from Section 3–117 of the Commercial Law Article:

Subject to applicable law regarding exclusion of proof of contemporaneous or previous agreements, the obligation of a party to an instrument to pay the instrument may be modified, supplemented, or nullified by a separate agreement of the obligor and a person entitled to enforce the instrument, if the instrument is issued or the obligation is incurred in reliance on the agreement or as part of the same transaction giving rise to the agreement. *To the extent an obligation is modified, supplemented, or nullified by an agreement under this section, the agreement is a defense to the obligation.*

Md.Code Ann. (1975, 2002 Repl.Vol.), § 3–117 of the Commercial Law Article (emphasis added).

when you give a check and it turns out to be bad, it is a criminal law violation if there is an immediate exchange of value. It's not a bad check violation if for any reason you hold the check or you do something different with it. You're paying it for rent. Or you're paying it for some payment on a loan or something like that. It's a civil violation breach of contract.

When asked to cite authority for this proposition, defense counsel replied that he did not have any, but that:

[DEFENSE COUNSEL]: I think it's a reasoning process, Your Honor, that if you read the statute the bad check statute it must be an immediate exchange for value for goods or services.

The court denied counsel's request to give the instruction, ruling as follows:

Well absent some authority for your proposition I'm not going to give the instruction requested. I'm going to give the standard instructions. You can argue what you think you can and as you understand the law. But I'm not going to give that instruction particularly in the abstract the way it's framed here. . . .

After argument on appellant's motion for judgment of acquittal at the end of all the evidence, the parties and the court discussed jury instructions anew. At the conclusion of that discussion, the following transpired:

[DEFENSE COUNSEL]: I do have a request, Your Honor, I think we need an instruction that distinguishes between the civil case of a breach of contract and the criminal case of their being a bad check. A check is a promise to pay that's a contract . . .

THE COURT: Do you have an instruction to submit?

[DEFENSE COUNSEL]: I don't have an instruction to submit.

THE COURT: Well I'm not in the habit of entertaining, ad-libbing instructions and why would I instruct the jury to

make a distinction between a civil and a criminal concept. This is not a civil case.

[DEFENSE COUNSEL]: Then I will phrase one if I may for the record very briefly and put it on the record even if the Court decides not to give it. And that is ...

THE COURT: All right, you may put whatever you want on the record.

[DEFENSE COUNSEL]: There can be a check for insufficient funds that is a breach of contract. Or there can be a check for insufficient funds that is a criminal charge.

THE COURT: Well I'm not going to instruct the jury to that effect. You can argue that if you wish. Any other instructions?

[DEFENSE COUNSEL]: No, Your Honor.

Following this, the court instructed the jury. Those instructions were based on the then-existing pattern instructions regarding the crimes at issue. The first instruction was for passing bad checks with knowledge of insufficient funds:

> The Defendant is also charged with the crime of obtaining property or services by a bad check. In order to convict the Defendant the State must prove, one, that the Defendant issued a check. Two, that the Defendant obtained property or services by issuing the check. Three, that the Defendant issued the check with knowledge that there were insufficient funds to cover that check and others outstanding. Four, that the Defendant issued the check with the intent or belief that payment would be refused. And five, that the check was ultimately dishonored and the Defendant did not make the check good within 10 days after dishonor. And six, that the value of the property or services obtained was at least $500.

*See* Maryland State Bar Ass'n, *Maryland Criminal Pattern Jury Instructions* 4:03, at 125 (2001) ("MPJI–Cr").

The second charge was for passing a check with the intent to stop payment:

The Defendant is also charged with the crime of obtaining property or services by a bad check. In order to convict the Defendant the State must prove, one, that the Defendant issued a check. Two, that the Defendant obtained property or services by issuing the check. Three, that the Defendant issued the check with the intent to stop payment on it. And four, that the Defendant stopped payment without the consent of the payee and the check was dishonored and that the value of the property or services obtained was at least $500.

*See* MPJI–Cr 4:03.1, at 127.

The jury was finally instructed as to the statutory presumption permitting the following inference based on passing a check with insufficient funds:

Knowledge that there were insufficient funds at the time the check was issued may be proved by the Defendant's conduct and by all the surrounding circumstances. There has been placed into evidence a certificate under oath from the bank's representative that the Defendant at the time of issuing the check did not have sufficient funds to cover that check and other outstanding checks. Base[d] on the certificate you are permitted but not required to infer that the Defendant knew there were insufficient funds in the account.

*See* MPJI–Cr 4:03.2, at 129.

At the conclusion of the jury instructions, the court asked the parties if they had any "further instructions or comments on instructions *other than what's already been placed on the record* . . . "(emphasis added). Both parties replied that there were no further exceptions. Despite the lack of exception, the State does not claim there was any procedural default with regard to the jury instructions. Given the trial court's statement suggesting that all of defense counsel's arguments placed on the record were preserved, we deem this issue properly before us.

 Maryland Rule 4–325(c) provides: "The court may, and at the request of any party shall, instruct the jury as to the applicable law and the extent to which the instructions are binding." "We review a trial judge's decision whether to give

a jury instruction under the abuse of discretion standard." *Arthur v. State,* 420 Md. 512, 525, 24 A.3d 667 (2011) (citations omitted). In determining whether a trial court has abused its discretion, we consider "(1) whether the requested instruction was a correct statement of the law; (2) whether it was applicable under the facts of the case; and (3) whether it was fairly covered in the instructions actually given." *Bazzle v. State,* 426 Md. 541, 549, 45 A.3d 166 (2012) (citation omitted).

"The threshold determination of whether the evidence is sufficient to generate the desired instruction is a question of law for the judge. The task of this Court on review is to determine whether the criminal defendant produced that minimum threshold of evidence necessary to establish a *prima facie* case ..." *Bazzle,* 426 Md. at 550, 45 A.3d 166 (citations omitted). "[A] defendant needs only to produce 'some evidence' that supports the requested instruction[.]" *Id.* at 551, 45 A.3d 166. (citations omitted). "If there is any evidence relied on by the defendant which, if believed, would support his claim ... the defendant has met his burden." *Id.*

Here, there is no dispute that there was "some evidence" of a hold agreement before the jury. We will discuss that evidence further in our consideration of the sufficiency of the evidence that follows. The question we must resolve now is whether the court erred in failing to give counsel's requested instructions. We begin with counsel's last request, prior to the court's instructions to the jury. At that time, counsel requested the court to give the following instruction:

> There can be a check for insufficient funds that is a breach of contract. Or there can be a check for insufficient funds that is a criminal charge.

Defense counsel has cited no authority for this specific instruction, nor have we found any. The State notes that we recognized, in dicta, that "[p]rinciples of criminal law are inapplicable to the problems arising out of these contractual disputes." *See Schwartz v. State,* 103 Md.App. 378, 393, 653 A.2d 958, *cert. denied,* 339 Md. 168, 661 A.2d 701 (1995). We are not persuaded that this proposed instruction would have

been helpful to the jury. In any event, we readily conclude that this general law was more than fairly covered by the court's instructions on the presumption of innocence and that the State had the burden to prove appellant's guilt beyond a reasonable doubt. We also conclude that appellant was not unfairly prejudiced by the court's refusal to give this instruction because the record establishes that the jury was otherwise informed about the difference between civil and criminal cases during closing argument. Defense counsel distinguished between the burdens of proof in bad check cases under civil law and under criminal law. Counsel further argued that, in a civil case, Scherl would not have had to prove that appellant intended to have the check dishonored. In a criminal case, by contrast, the burden was proof beyond a reasonable doubt that appellant intended to have the check dishonored and that he knew that there were insufficient funds. We conclude the trial court properly exercised its discretion in declining appellant's requested instruction concerning the general difference between passing a bad check resulting in civil versus criminal prosecution.

■ Next, considering the trial court's clear indication that the argument had been preserved, we turn to appellant's earlier requested instruction:

"To the extent an obligation is modified, supplemented, or nullified by an agreement, the agreement is a defense to the obligation."

Defense counsel indicated that he found this language in the Commercial Law Article. Indeed, this sentence is part of the Uniform Commercial Code and is found in Section 3–117 of the Commercial Law Article:

Subject to applicable law regarding exclusion of proof of contemporaneous or previous agreements, the obligation of a party to an instrument to pay the instrument may be modified, supplemented, or nullified by a separate agreement of the obligor and a person entitled to enforce the instrument, if the instrument is issued or the obligation is incurred in reliance on the agreement or as part of the same

transaction giving rise to the agreement. To the extent an obligation is modified, supplemented, or nullified by an agreement under this section, the agreement is a defense to the obligation.

Md.Code Ann. (1975, 2002 Repl.Vol.), § 3–117 of the Commercial Law Article.

Section 3–117 is in the part of the code governing negotiable instruments. We conclude that the provision is inapplicable to the criminal charges in this case. It expressly provides that it is to be supplemented by State law in addition to the Uniform Commercial Code with respect to the applicability of the parol evidence rule. There was no written agreement other than the checks. More important, the section deals with when an agreement, in addition to the negotiable instrument in question, may constitute a defense to civil liability on the instrument. We are not concerned with civil liability on the instrument. Appellant does not assert non-liability, only that the check was to be held until there were sufficient funds in the account, thereby avoiding criminal responsibility.

Having dispensed with two of appellant's specific requested instructions, we turn now to his more general complaint. Counsel's argument before the trial court was that:

[W]hen you give a check and it turns out to be bad, it is a criminal law violation if there is an immediate exchange of value. It's not a bad check violation if for any reason you hold the check or you do something different with it.

It was apparent that counsel was requesting an instruction on the nature of the hold-check agreement that was in dispute in this case. It also appears that counsel referred the court to language contained on the website for the District Court of Maryland. That website states the following:

**What is a Bad Check Violation?**

A bad check violation occurs when a person gives another person or business a bad check for an immediate exchange of goods or services.

Two conditions must be met to charge an individual with a bad check violation:

> An immediate exchange of goods or services. A bounced check is not always a bad check violation. For example, payments under a contract, such as checks for rent, utilities, or car payments are not bad check violations. Debtors must be pursued through civil litigation in these instances.
>
> The check must have been refused for payment upon presentation to the bank or institution on which it was drawn. The refusal for payment must have been for insufficient funds, an account that does not exist, is closed, or has a hold on it.
>
> **Bad Check Violation v. Breach of Contract**
>
> If a customer gives you a check for an item and you agree to hold the check until a certain date or for a few days, then you are, in effect, extending credit to the customer. If the check is refused for payment after that time period, you cannot charge the person with a bad check violation. Because the exchange was not immediate, to recover the money owed to you, you must sue the person in civil court for breach of contract.

*http://www.courts.state.md.us/district/selfhelp/badcheck.html* [5]

Defense counsel clarified his argument requesting an instruction based on this language in his motion for new trial. After talking to the Clerk's office for the District Court, counsel gleaned the following:

> One is that a bad check violation occurs when a person gives another person or a business a bad check for an immediate exchange of goods or services. And then further that payments under a contract, such as checks for rent, utilities, car payments are not bad check violations. And debtors in those cases must be pursued through civil litigation. And the facts in this case are pretty simple. There was some kind of contractual agreement, it was unfortunately verbal

---

**5.** The authority for these provisions is not provided on the District Court website, and that website notably includes the following disclaimer: "Information is intended to inform the public and not serve as legal advice. Any reproduction of this material must be authorized by the Office of the Chief Clerk of the District Court of Maryland."

in nature, business arrangements between the State's main witness and my client's business that he was co-owner of. And but it was there, it was established that there was an agreement where cars, vehicles were going to be consigned and then the company was going to sell it to third persons and then the company was going to pay an amount determined by the State's witness. Well that's tantamount to a car payment. It's a payment under a contract. And therefore the law in Maryland and as I submitted to the Court also there are a couple of Maryland cases that refer to this and there is one in particular that is out of the State of Colorado that refers to it. And that is simply that these checks, although they were bad in the commonsense, were not bad checks under the Maryland Criminal Statute. And that is because they were payments pursuant to a contract.

■ At oral argument, the State conceded that the determinative issue in this case was whether there was an oral hold-check agreement between the appellant and Scherl. If there was such a hold-check agreement, the State agreed that the jury most likely would not have convicted appellant of the offenses. The issue before us, then, is whether the statutes contemplate such a hold-check agreement and whether the trial court properly instructed on such a law. We recognize that such a precise instruction was not requested by the appellant. However, it is the trial court's responsibility to accurately instruct on the applicable law. As the Court of Appeals has stated:

We have said that whether the instruction is a correct statement of law "is independent of the facts of the case in which it is given, which results in it being determinative of whether the instruction ... is *per se* improper." [*Thompson v. State*, 393 Md. 291, 303, 901 A.2d 208 (2006) ]. Thus, a trial judge is required to give a requested instruction that states applicable law correctly and has not been fairly covered by other instructions. *Patterson* [*v. State* ], 356 Md. [677] at 683–84, 741 A.2d [1119] at 1122 [ (1999) ]; *Gunning v. State*, 347 Md. 332, 347, 701 A.2d 374, 382 (1997).

*Dickey v. State,* 404 Md. 187, 198, 946 A.2d 444 (2008) (footnote omitted).

In addition, this Court has indicated:

We hold that the court must instruct the jury on a matter which is a proper subject for instructions where a timely request has been made even though that request is not totally accurate and may contain some erroneous material. To hold otherwise would be to place on the parties the responsibility for determining what the law is, a responsibility which is properly entrusted to the court.

*Abbott v. State,* 190 Md.App. 595, 641, 989 A.2d 795 (2010) (quoting *Clark v. State,* 80 Md.App. 405, 412, 564 A.2d 90 (1989)).

 In determining whether the statutes at issue contemplate a hold-check agreement, we begin with well-established principles of statutory construction:

In statutory interpretation, our primary goal is always "to discern the legislative purpose, the ends to be accomplished, or the evils to be remedied by a particular provision, be it statutory, constitutional or part of the Rules." We begin our analysis by first looking to the normal, plain meaning of the language of the statute, reading the statute as a whole to ensure that " 'no word, clause, sentence or phrase is rendered surplusage, superfluous, meaningless or nugatory.' " Further, whenever possible, an interpretation should be given to the statutory provisions which does not lead to absurd consequences. If the language of the statute is clear and unambiguous, we need not look beyond the statute's provisions and our analysis ends. If however, the language is subject to more than one interpretation, it is ambiguous, and we resolve that ambiguity by looking to the statute's legislative history, case law, and statutory purpose.

*Barbre v. Pope,* 402 Md. 157, 172–73, 935 A.2d 699 (2007) (internal citations omitted).

 Further:

Of import here, we are obligated to construe the statute as a whole, so that all provisions are considered together

and, to the extent possible, reconciled and harmonized. When "appropriate," we interpret a provision "in the context of the entire statutory scheme of which it is a part." Put another way, when a provision "is part of a general statutory scheme or system, the sections must be read together to ascertain the true intention of the Legislature."

*Nelson v. State*, 187 Md.App. 1, 12, 975 A.2d 298 (2009) (citations omitted).

## A. *Talbot Bank checks*

Appellant was charged, and ultimately convicted, of four counts of issuing bad checks with knowledge of insufficient funds pursuant to Section 8–103(a) of the Criminal Law Article. *See* Md.Code (2002, 2012 Repl.Vol.), § 8–103(a) of the Criminal Law Article. ("C.L."). That statute provides as follows:

a) A person may not obtain property or services by issuing a check if:

(1) the person knows that there are insufficient funds with the drawee to cover the check and other outstanding checks;

(2) the person intends or believes when issuing the check that payment will be refused by the drawee on presentment; and

(3) payment of the check is refused by the drawee on presentment.

C.L. § 8–103(a).

There was no dispute in this case that payment was refused upon presentment, therefore, we need not spend much time on subsection 8–103(a)(3). The first question for the fact finder in this case was whether appellant did "obtain property or services" by issuing a check. "Obtain" "has the meaning stated in § 7–101 of this article." C.L. § 8–101(f). Under C.L. § 7–101, "obtain" means:

(1) in relation to property, to bring about a transfer of interest in or possession of the property; and

(2) in relation to a service, to secure the performance of the service.

C.L. § 7–101(g).

"Property," under the pertinent statute, "has the meaning stated in § 7–101 of this article." C.L. § 8–101(h). Under C.L. § 7–101, "property" is defined as follows:

(1) "Property" means anything of value.

(2) "Property" includes:

(i) real estate;

(ii) money;

(iii) a commercial instrument;

(iv) an admission or transportation ticket;

(v) a written instrument representing or embodying rights concerning anything of value, or services, or anything otherwise of value to the owner;

(vi) a thing growing on or affixed to, or found on land, or part of or affixed to any building;

(vii) electricity, gas, and water;

(viii) a bird, animal, or fish that ordinarily is kept in a state of confinement;

(ix) food or drink;

(x) a sample, culture, microorganism, or specimen;

(xi) a record, recording, document, blueprint, drawing, map, or a whole or partial copy, description, photograph, prototype, or model of any of them;

(xii) an article, material, device, substance, or a whole or partial copy, description, photograph, prototype, or model of any of them that represents evidence of, reflects, or records a secret:

1. scientific, technical, merchandising, production, or management information; or

2. designed process, procedure, formula, invention, trade secret, or improvement;

(xiii) a financial instrument; and

(xiv) information, electronically produced data, and a computer software or program in a form readable by machine or individual.

C.L. § 7–101(i).

"Service," under the statute, is defined as:

(1) labor or professional service;

(2) telecommunication, public utility, toll facility, or transportation services;

(3) lodging, entertainment, or restaurant service; and

(4) the use of computers, data processing, or other equipment.

C.L. § 8–101(j).

There was no request by appellant to instruct the jury as to the meaning of "obtain property or services," thus, we will leave the issue of whether the appellant obtained such items to our discussion of the sufficiency of the evidence that follows. Suffice it to say, with respect to these counts, that the jury was instructed that they needed to determine whether appellant "obtained property or services by issuing the check." There is also no dispute that the jury was accurately instructed that the check needed to be dishonored in order to find the defendant guilty. *See* C.L. § 8–103(a)(3).

We turn to C.L. subsection 8–103(a)(1), which requires that the appellant knew that there were insufficient funds to cover the check and other outstanding checks. There is a statutory presumption that informs the element of knowledge:

The drawer or representative drawer is presumed to know that there are insufficient funds whenever the drawer of a check has insufficient funds with the drawee to cover the check and other outstanding checks when issuing the check.

C.L. § 8–104(a).[6]

These provisions concern whether the drawer, *i.e.*, the defendant, knew at the time that the check was issued, that

---

6. The court was not asked to instruct on any of the statutory presumptions applicable to the underlying crimes.

there were insufficient funds to cover the check and other outstanding checks. In a case such as this, where there is a dispute over the existence of a hold-check agreement, it appears that knowledge of insufficiency of funds is a given. Accordingly, we are unable to conclude that the court erred when it instructed the jury that they needed to determine if the defendant "issued the check with knowledge that there were insufficient funds to cover the check and others outstanding."

 That leaves us with the second element of issuing a bad check; the element of intent. C.L. subsection 8–103(a)(2) requires that "the person intends or believes *when issuing the check* that payment *will be refused* by the drawee *on present-ment* . . ." (emphasis added). Our reading of the emphasized language suggests a temporal component to the intent element. In order to find a defendant guilty, the jury must be convinced that the defendant intended, at the time he or she issued the check, that payment would be refused when the payee presented the check to the drawee. That there is such a temporal component to the intent element is confirmed when one considers the statutory presumption applicable to this subsection:

The drawer or representative drawer of a dishonored check is presumed to have intended or believed that the check would be dishonored on presentment if:

(1) the drawer had no account with the drawee when issuing the check; or

(2) (i) when issuing the check, the drawer had insufficient funds with the drawee to cover the check and other outstanding checks;

(ii) the check was presented to the drawee for payment *not more than 30 days after the date of issuing the check;* and

(iii) the drawer had insufficient funds with the drawee at the time of presentment.

C.L. § 8–104(b) (emphasis added).

It appears that the legislature contemplated that, in order to find that a defendant/drawer intended to defraud a payee

when issuing a check drawn on insufficient funds, there was a certain time within which an intentional fraud would no longer be presumed. This is supported by commentary in the legislative history concerning the statutory presumption:

> Under the terms of this subsection, conditions are set forth by which the intent or belief on the part of the defendant that is required by [former] Section 141(a)(2) (an intent or belief that the check would be dishonored—*see* lines 657–658 at p. 73) may be presumed from the establishment of certain facts. Two factual situations are outlined under which the presumption will arise. The first is when the drawer had no account with the drawee. The second is when the drawer had insufficient funds at the time of utterance and presentation of the check, *if the time of presentment was not more than thirty days after the date of utterance.*
>
> The existence of this presumption does not, however, relieve the State of its obligation to prove conclusively the requisite intent on the part of the defendant.

*Revision of Maryland Theft Laws and Bad Check Laws,* 1978 Md. Laws ch. 849 (S.B. 1153) (emphasis added).

Our review of the plain language of the statutes, as well as our consideration of the legislative intent, persuades us that the legislature contemplated situations where the payee of a check might not attempt to cash that check within a certain timeframe after utterance. Apparently finding that thirty days after utterance was a reasonable time in which a payee should seek remuneration, the legislature expressly created a presumption to that effect. That, as well as the plain language in C.L. subsection 8–103(a)(2), suggests that a finding of intentional fraud depends on considerations of time between utterance and presentment.

This conclusion is supported by cases from other states. For instance, the intermediate appellate court in California has stated that:

> "[W]here . . . at the time the check is drawn and delivered to him, the payee has knowledge, or an understanding, that

it is not then good or collectible, the offense [of issuing a worthless check] has not been committed. [Citations.] This is so because there is then no false representation that the check is good, which is a necessary element of the offense at which the statute is directed."

*People v. Wolfe*, 235 Cal.App.3d 605, 608, 1 Cal.Rptr.2d 400 (Cal.Ct.App.1991) (quoting *People v. Poyet*, 6 Cal.3d 530, 536, 99 Cal.Rptr. 758, 492 P.2d 1150 (1972) (emphasis omitted)).

A similar conclusion was drawn by the Appellate Court of Illinois:

"Where the parties agree at the time the check is issued that it shall not be presented for payment until a later date, and the fair implication is that there were not sufficient funds at the time the check was issued[,] the offense is generally held not to have been committed because the fraudulent intent is lacking, the transaction being in its essential nature an extension of credit to the drawer."

*People v. McLaughlin*, 123 Ill.App.3d 24, 78 Ill.Dec. 756, 462 N.E.2d 875, 876 (1984) (quoting *People v. Cundiff*, 16 Ill. App.3d 267, 305 N.E.2d 735, 738 (1973)).

Other states also conclude that, where there was evidence of some form of agreement akin to a hold-check agreement, the intent element is lacking. *See In re Bullock*, 322 B.R. 176, 181 (Bankr.M.D.Ala.2005) (under a statute, similar to Maryland's, prohibiting negotiating a worthless negotiable instrument, court stated that it was not a crime *where a person agrees* to hold a check, knowing that it was not good at the time it was accepted); *Highsmith v. State*, 38 Ga.App. 192, 143 S.E. 445 (Ga.Ct.App.1928) (where *the parties agreed* that the victim would not try to cash the check for two weeks after it was issued, "the transaction was nothing more nor less than an extension of credit"); *Henderson v. State*, 534 So.2d 554, 555–56 (Miss.1988) (holding there was no violation of a specific statute prohibiting the fraudulent uttering of a check, knowing at the time the check was uttered, that there was insufficient funds *where it was understood* that the check would be presented three weeks after uttering); *State v. Reynolds*, 147

A.D.2d 961, 537 N.Y.S.2d 716, 717 (1989) (conviction for bad check reversed *where victim knew* that the checks should not be cashed until the defendant called and advised that they were good), *appeal denied,* 74 N.Y.2d 746, 545 N.Y.S.2d 120, 543 N.E.2d 763 (1989); *State v. Creachbaum,* 24 Ohio App.2d 31, 263 N.E.2d 675, 679 (1970) (concluding that there was no intent to defraud when *the payee knew or understood* that there were insufficient funds to cover the check when issued), *aff'd,* 28 Ohio St.2d 116, 276 N.E.2d 240 (1971). *But see State v. Stewart,* 155 N.H. 212, 921 A.2d 933, 939 (2007) (concluding that, where intent to defraud is not an element of the offense of issuing a bad check, knowledge of insufficient funds or a hold-check agreement is simply evidence relevant to establishing *mens rea* ); *State v. Forbes,* 779 A.2d 637, 641–43 (R.I. 2001) (holding that state statutes do not recognize a defense that payee knew of insufficient funds, and that intent to defraud is presumed if payment is not made to victim upon notice within a certain statutory timeframe); *State v. Levy,* 220 N.C. 812, 18 S.E.2d 355, 357–58 (1942) (concluding that a hold-check agreement will not exculpate a defendant where the statute only requires that defendant knew he had insufficient funds when the check was issued).

■■■ Accordingly, we are persuaded that, under Section 8–103(a), a defendant is entitled to a jury instruction on the application of a hold-check agreement as it concerns the requisite element of intent. We are also persuaded that the jury instruction in this case did not fairly cover hold-check agreements. The trial court erred in not fashioning a proper instruction explaining the law of intent as it concerned violations of C.L. § 8–103(a).

B. *Queenstown Bank checks*

We are unable to come to the same conclusion with respect to the three checks drawn on the Queenstown Bank that were dishonored based on stop payment orders. Those charges came under C.L. § 8–103(b), which provides:

A person may not obtain property or services by issuing a check if:

(1) when issuing the check, the person knows that the person or, in the case of a representative drawer, the person's principal intends, without the consent of the payee, to stop or countermand the payment of the check, or otherwise to cause the drawee to disregard, dishonor, or refuse to recognize the check; and

(2) payment is refused by the drawee on presentment.

C.L. § 8–103(b).

The statutory presumption applicable to this section, in turn, provides:

The fact that a drawer or representative drawer, without the consent of the payee, stopped or countermanded the payment of the check, or otherwise caused the drawee to disregard, dishonor, or refuse to recognize the check without returning or tendering the return of the property obtained, is presumptive evidence that the drawer or representative drawer had the intent when issuing the check to stop or countermand payment or otherwise cause the drawee to disregard, dishonor, or refuse to recognize the check.

C.L. § 8–103(d).

■■ While intent to stop payment is an element under Section 8–103(b), we do not discern in the plain language any temporal component similar to that evident under Section 8–103(a), as well as the presumptions in support of that section. Unlike subsection (a), the intent required to prove a violation under subsection (b) does not depend upon when the payee attempts to present the check to the drawee. The evidence of a hold-check agreement was not relevant to this section. Accordingly, we conclude that the trial court did not err when it gave the pattern instruction governing the three offenses of issuing a bad check with the intent to stop payment under C.L. § 8–103(b).

## II.

Having concluded that a retrial is required on the four Talbot Bank convictions, we still must consider appellant's sufficiency claim. *See Markham v. State,* 189 Md.App. 140, 168–169, 984 A.2d 262 (2009) ("If we agreed that the evidence was insufficient to support any of his convictions, appellant could not be retried on those charges"). The Court of Appeals has reiterated the appropriate standard of review

We examine the record solely to determine whether "any rational trier of fact could have found the essential elements of the crime [ ] beyond a reasonable doubt." *Moye v. State,* 369 Md. 2, 12 [796 A.2d 821] (2002); *accord Jackson v. Virginia,* 443 U.S. 307, 319 [99 S.Ct. 2781, 61 L.Ed.2d 560] (1979) ("[T]he critical inquiry on review of the sufficiency of the evidence to support a criminal conviction . . . is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.") In so doing, "[i]t is not our role to retry the case." *Smith v. State,* 415 Md. 174, 185 [999 A.2d 986] (2010). Rather, "[b]ecause the fact-finder possesses the unique opportunity to view the evidence and to observe first-hand the demeanor and to assess the credibility of witnesses during their live testimony, we do not re-weigh the credibility of witnesses or attempt to resolve any conflicts in the evidence." *Id.,* citing *Tarray v. State,* 410 Md. 594, 608 [979 A.2d 729] (2009). We defer to any possible reasonable inferences the [trier of fact] could have drawn from the admitted evidence and need not decide whether the [trier of fact] could have drawn other inferences from the evidence, refused to draw inferences, or whether we would have drawn different inferences from the evidence. *State v. Smith,* 374 Md. 527, 557 [823 A.2d 664] (2003); *see also State v. Albrecht,* 336 Md. 475, 478 [649 A.2d 336] (1994) ("[I]t is not the function or duty of the appellate court to undertake a review of the record that would amount to, in essence, a retrial of the case").

*State v. Mayers,* 417 Md. 449, 466, 10 A.3d 782 (2010) (some internal citations omitted).

A. *Talbot Bank check convictions*

As to the first four checks drawn on the Talbot Bank that were dishonored for insufficient funds, appellant contends that there were adequate funds to cover these checks, and that there was insufficient evidence that he intended to defraud Scherl. The State responds that it was for the jury to decide whether appellant intended to defraud Scherl.

Looking to the evidence in the light most favorable to the State, pursuant to the charges under C.L. § 8–103(a), the jury could have inferred that appellant obtained property in exchange for issuing the checks, in that Scherl transferred interest in, or possession of the title to the four vehicles in question. *See* C.L. § 7–101(g). The definition of "property" includes, *inter alia,* "anything of value," as well as "a written instrument representing or embodying rights concerning anything of value ..." *See* C.L. §§ 7–101(i)(1), (i)(2)(v). A title to a vehicle is an item of value and clearly embodies certain rights to that vehicle. *See generally,* Title 13, Vehicle Laws–Certificates of Title and Registration of Vehicles, Md.Code (1977, 2006 Repl.Vol., 2012 Supp.), Transportation Article.

As for the three elements necessary to prove a violation of Section 8–103(a), there is no dispute that all four checks drawn on the Talbot Bank account were ultimately dishonored for insufficient funds. Thus, this establishes the third element, that the "payment of the check is refused by the drawee on presentment." C.L. § 8–103(a)(3).[7]

Next, the jury had to determine whether appellant knew that there were "insufficient funds with the drawee to cover the check and other outstanding checks." C.L. § 8–

---

7. Appellant agreed that he never paid Scherl any money due on the seven checks. Accordingly, any reliance appellant places on C.L. § 8–105, the section limiting criminal prosecution where the issuer has made the bad check good within ten days of its dishonor, is entirely misplaced.

103(a)(1). According to the Talbot Bank representative, with respect to three of the checks, *i.e.*, checks numbers 2582 (Pontiac), 2583 (Saturn), and 2584 (Nissan), there were insufficient funds in the account to cover all three of these checks. As for whether appellant knew that there were insufficient funds to cover these checks, appellant agreed he signed these checks, but testified that he did not know if there were sufficient funds for these checks because of the alleged hold-check agreement with Scherl. Despite this testimony, we are persuaded that whether appellant had knowledge of sufficient funds was properly best left for the jury. *See Sifrit v. State*, 383 Md. 116, 135, 857 A.2d 88 (2004) (the jury is "free to believe some, all, or none of the evidence presented").

As for the fourth check, check number 2568 (Mazda), there was evidence arguably establishing the existence of sufficient funds in the Talbot Bank account to cover this check on the day it was issued. Nevertheless, we agree with the State that whether appellant knew there were sufficient funds to cover that check and other outstanding checks was a jury question. Indeed, appellant agreed Rokabil had other bills to pay, other than those due Scherl.

 Finally, turning to the remaining element of intent, we conclude that whether the jury believed appellant intended, when issuing the check, that payment would be refused when Scherl presented the check to the drawee, depended upon whether the jury believed there was a hold-check agreement in this case. *See* C.L. § 8–103(a)(2). In other words, our sufficiency determination depends on whether there was evidence from which the jury could conclude that there was, or was not, such an agreement.

Appellant steadfastly maintained throughout this case that Rokabil and Scherl were working under such an understanding. The existence of the hold-check agreement was corroborated by Northcut. In comparison, Scherl agreed that "there were a couple of occasions where they had asked to hold the check up because of funding." But, Scherl did not recall whether there were any agreements with respect to the

checks at issue in this case. Scherl also testified that he removed his cars from the Rokabil lot after he was not being paid in exchange for delivering title.

We conclude that this evidence was insufficient to establish that appellant intended to defraud Scherl. The State's burden was to prove intent to defraud beyond a reasonable doubt, *i.e.*, to prove that no hold-check agreement actually existed. The State's case rested entirely on Scherl. But, Scherl did not recall whether there was any hold-check agreement, especially with respect to the four Talbot Bank checks. Indeed, his own testimony confirming that he held checks from time to time undermines any claim that there was no hold-check agreement in this case. Because there was no evidence before the jury that there was not a hold-check agreement, we are persuaded that the State failed to prove the requisite intent element in this case beyond a reasonable doubt. Accordingly, because the evidence was insufficient to prove intent, we shall reverse appellant's four convictions under C.L. § 8–103(a).

B. *Queenstown Bank checks*

▆▆ Finally, we are unable to reach the merits with respect to the three checks drawn on the Queenstown Bank, dishonored following the stop payment orders, due to preservation issues. We explain. Maryland Rule 4–324(a) provides:

A defendant may move for judgment of acquittal on one or more counts, or on one or more degrees of an offense which by law is divided into degrees, at the close of the evidence offered by the State and, in a jury trial, at the close of all the evidence. The defendant shall state with particularity all reasons why the motion should be granted. No objection to the motion for judgment of acquittal shall be necessary. A defendant does not waive the right to make the motion by introducing evidence during the presentation of the State's case.

▆▆▆ A criminal defendant who moves for judgment of acquittal is required by Md. Rule 4–324(a) to " 'state with particularity all reasons why the motion should be granted[,]'

and is not entitled to appellate review of reasons stated for the first time on appeal." *Starr v. State,* 405 Md. 293, 302, 951 A.2d 87 (2008) (quoting *State v. Lyles,* 308 Md. 129, 135, 517 A.2d 761 (1986)). "The language of the rule is mandatory, and review of a claim of insufficiency is available only for the reasons given by appellant in his motion for judgment of acquittal." *Whiting v. State,* 160 Md.App. 285, 308, 863 A.2d 1017 (2004) (citations omitted), *aff'd,* 389 Md. 334, 885 A.2d 785, (2005); *accord Nash v. State,* 191 Md.App. 386, 404, 991 A.2d 831, *cert. denied,* 415 Md. 42, 997 A.2d 792 (2010) (emphasis in original) (quoting *Sparkman v. State,* 184 Md. App. 716, 739, 968 A.2d 162 (citation and quotations omitted), *cert. denied,* 410 Md. 166, 978 A.2d 246 (2009).)

At trial, appellant contended the evidence was insufficient to prove that he either ordered the stop payment or had the authority to do so. On appeal, he abandons that argument and now argues that the checks were issued to cover a pre-existing debt first manifested by certain checks drawn on the Talbot Bank account. Referencing the statute, appellant asserts that he did not "obtain property or services" when these replacement checks were issued.

It is arguable that appellant did not obtain "property" when he issued new checks to replace old checks based upon a pre-existing debt. *See, e.g., Heffernan v. State,* 209 Md.App. 231, 241, 58 A.3d 547 (2012) (recognizing that a defendant does not violate the statute when the check is given for an existing obligation) (citing *State v. Sinclair,* 274 Md. 646, 658, 337 A.2d 703 (1975)). However, we agree with the State that appellant never made this argument in the trial court.

Further, while there was evidence before the jury that appellant signed the Queenstown Bank checks, there was also evidence that appellant neither had the authority to sign nor the authority to order stop payments on any of those checks. And, appellant flat out denied ordering stop payment on the checks during his testimony. And yet, appellant makes no argument on appeal maintaining this theory of the case. The failure to properly argue the question precludes appellate

review. *See Pride Mark Realty v. Mullins,* 30 Md.App. 497, 511, 352 A.2d 866 ("When an issue, although raised below, is not raised on appeal, it is not before us and we are as completely denied the right to review such question as if the appeal were premature or had not been taken at all"), *cert. denied,* 278 Md. 730 (1976); *see also* Md. Rule 8–504 (a brief shall include "[a]rgument in support of the party's position"); *Pack Shack, Inc. v. Howard County,* 377 Md. 55, 89 n. 14, 832 A.2d 170 (2003) ("Failure to discuss or specifically argue an issue in briefs or oral argument, or to set forth the authority for a proposition, properly is viewed as a waiver of that issue") (Harrell, J., concurring in part and dissenting in part); *Moosavi v. State,* 355 Md. 651, 660, 736 A.2d 285 (1999) ("[I]f a point germane to the appeal is not adequately raised in a party's brief, the [appellate] court may, and ordinarily should, decline to address it" (citation omitted)); *Klauenberg v. State,* 355 Md. 528, 552, 735 A.2d 1061 (1999) ("[A]rguments not presented in a brief or not presented with particularity will not be considered on appeal").

Ultimately, as to these three Queenstown Bank related counts, "[w]hat the appellant did preserve for appellate review is not now argued; what is now argued was not preserved for appellate review." *Bridges v. State,* 116 Md.App. 113, 136, 695 A.2d 609 (1997). As there is no challenge to the three Queenstown Bank check convictions properly before this Court, those judgments will remain as entered in the circuit court.

**JUDGMENT AFFIRMED IN PART AND REVERSED IN PART. COUNTS 10, 12, 14, AND 16 REVERSED. JUDGMENT OTHERWISE AFFIRMED.**

**COSTS TO BE ASSESSED HALF TO APPELLANT AND HALF TO TALBOT COUNTY.**